Honorable Richard A. Jones

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

UNITED STATES OF AMERICA,

                        Plaintiff,

        v.

JOSEPH NILSEN,

                        Defendant.

No.: CR-20-151 RAJ

DEFENDANT JOSEPH NILSEN'S
SENTENCING MEMORANDUM

SENTENCING:
Friday, September 8, 2023

# TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ...................................................... iv

PRELIMARY STATEMENT ...................................................... 1

I.     MR. NILSEN'S PERSONAL HISTORY AND CHARACTERISTICS ........................... 4

     A.    Mr. Nilsen's Childhood Was Marked by Domestic Violence
           and Instability ................................................................. 4

     B.    Mr. Nilsen's Efforts to Find Stability and His Struggle with
           Opioid Addiction ............................................................. 8

     C.    Mr. Nilsen's Entry into E-Commerce Business ................................ 11

     D.    Mr. Nilsen's Mental Health Diagnoses ....................................... 14

     E.    Mr. Nilsen's Serious and Debilitating Medical Conditions .................... 15

     F.    Mr. Nilsen's Post-Offense Rehabilitation .................................... 19

II.    THE CIRCUMSTANCES OF THE OFFENSE AND MR. NILSEN'S
     RELATIONSHIP TO HIS CO-DEFENDANTS .................................... 23

III.   THE APPLICABLE SENTENCING GUIDELINES AND THE
     PRESENTENCE REPORT .................................................. 28

IV.   MR. NILSEN'S RESPONSE TO THE GOVERNMENT'S MOTION
     PURSUANT TO USSG §5K1.1 ............................................. 30

V.    THE 3553(a) FACTORS WARRANT A NON-CUSTODIAL SENTENCE ................. 33

     A.    Mr. Nilsen's Trauma History and Resulting Psychological
           Conditions Mitigate His Culpability and Warrant Leniency .................... 34

     B.    Mr. Nilsen has Rehabilitated, Demonstrating that There is No Risk
           of Recidivism and That a Prison Sentence is Not Needed to Protect
           the Public or Achieve Specific Deterrence. ................................... 37

     C.    A Sentence of Incarceration Would Impose Undue Hardship, as Mr. Nilsen Needs
           Substantial Medical and Mental Health Treatment ............................ 41

     D.    A Variance is Also Warranted Because Mr. Nilsen's 2014 Misdemeanor
           Conviction has a Disproportionate Effect on Mr. Nilsen's Guidelines Range ..... 45

     E.    A Prison Sentence is Not Needed to Meet the Goals of General Deterrence,
           Promote Respect for the Law or Avoid Unwarranted Disparities ................ 47

F.      A Term of Incarceration Will Impose Hardship on Others .................................. 51

CONCLUSION................................................................................................................... 53

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Acosta v. United States* ,No. CR 04-645-JFW,
   2010 WL 11681518 (C.D. Cal. May 21, 2010) ...................................................... 38

*Gall v. United States*,
   552 U.S. 38 (2007) ................................................................................... 3, 34, 51

*Pepper v. United States*,
   562 U.S. 476 (2011) ......................................................................................... 34

*United States. v. Leon*,
   341 F.3d 928 (9th Cir.2003) ............................................................................. 52

*United States v. Boy*,
   19 F.3d 30 (9th Cir. 1994) ............................................................................... 42

*United States v. Brady*,
   417 F.3d 326 (2d Cir.2005) ............................................................................. 36

*United States v. Bryson*,
    F.3d 742,  Cir. 1998) ................................................................................. 38, 42

*United States v. Carty*,
   264 F.3d 191 (2d Cir. 2001) ............................................................................. 44

*United States v. Carty*,
   520 F.3d 984 (9th Cir.2008) ............................................................................. 34

*United States v. Edwards*,
   595 F.3d 1004 (9th Cir. 2010) ........................................................................... 48

*United States v. Milikowsky, .*
   65 F.3d 4, 8 (2d Cir.1995) ............................................................................... 53

*United States v. Leonti*,
   326 F.3d 1111 (9th Cir. 2003) ........................................................................... 50

*United States v. Lopez-Salas*,
   266 F.3d 842 (8th Cir.2001) ............................................................................. 44

*United States v. McBride*,
   511 F.3d 1293 (11th Cir. 2007) ......................................................................... 35

*United States v. Rioux*,
    97 F.3d 648 (2d Cir. 1996) ................................................................ 42

*United States v. Shadduck*,
    889 F. Supp. 8 (D. Mass. 1995) ....................................................... 44

*United States v. Singh*,
    877 F.3d 107 (2d Cir. 2017) ............................................................. 34

*United States v. Walter*,
    256 F.3d 891 (9th Cir. 2001) ............................................................ 34

**Statutes**

18 U.S.C. §3553

18 U.S.C. § 371 .................................................................................... 1

18 U.S.C. § 1349 .................................................................................. 1

26 U.S.C. § 7206(1) ............................................................................. 1

**Rules**

USSG §5H1.4 ....................................................................................... 4

USSG §5H1.6 ..................................................................................... 52

USSG §5K1.1 .............................................................................. *passim*

USSG §§2B4.1(b) ............................................................................... 28

USSG §5K1.1(a)(3). ........................................................................... 32

USSG §§2E1.2(a)(2) and 2B4.1(a)): ................................................. 28

USSG §§2T1.1(a)(1) and 2T4.1(E)): .................................................. 28

**Regulations**

Sentencing Guidelines for United States Courts,
    88 Fed. Reg. 28254 (May 3, 2023) (effective Nov. 1, 2023). ............... 46

**Other Authorities**

S. Rep. No. 98-225 ............................................................................. 48

1    Joseph Nilsen, by and through his attorneys, Sher Tremonte LLP and Robert Flennaugh,

2    Esq., respectfully submits this sentencing memorandum, and Mr. Nilsen's Response to the

3    Government's Motion Pursuant to USSG §5K1.1.  *See* Local Rule CrR 32(i)(1)(A).

4                              **PRELIMINARY STATEMENT**

5         Those who know Joseph Nilsen best vouch that he is kind, generous to a fault, and

6    devoted to the people he loves.  More than that, his moral compass is strong: he is "a genuinely

7    good person" who "knows right from wrong, good from bad."  Yet for approximately three

8    years, between 2017 and 2020, Mr. Nilsen lost sight of this compass, and engaged in a scheme to

9    bribe Amazon insiders to obtain confidential business information, which, in turn, was used to

10   assist third party sellers (hereinafter "3P") to circumvent a variety of Amazon's rules governing

11   its selling platforms.  At various times, Mr. Nilsen also helped others participate in acts of online

12   sabotage to take down third party sellers' accounts.  Over the course of this scheme, Mr. Nilsen

13   portrayed himself online with an outsized bravado that belied his profound social anxiety and

14   fragile personality.  He is deeply ashamed of this conduct and takes full and unequivocal

15   responsibility for his crimes.

16        Pursuant to a cooperation agreement with the government, Mr. Nilsen pled guilty to

17   conspiracy to commit violations of the Travel Act (18 U.S.C. § 371); conspiracy to commit wire

18   fraud (18 U.S.C. § 1349); and filing a false tax return (26 U.S.C. § 7206(1)).  The parties agree

19   that his adjusted offense level is 17, and his criminal history category is I, corresponding to a

20   recommended guidelines range of 24-30 months.  The Government recommends a sentence of 19

21   months, which reflects a 20% reduction for Mr. Nilsen's substantial assistance, and the Probation

22   Department recommends a 20-month sentence, less "whatever departure the Court deems

Defendant Joseph Nilsen's Sentencing Memorandum-1
*United States v. Nilsen, et al.,* No. CR20-151 RAJ

Justine A. Harris
Krista Staropoli
Sher Tremonte LLP
90 Broad St., Floor 23
New York, NY 10004

1    appropriate based on the defendant's cooperation."  Probation Recommendation at 4.

2          While the Government and the Probation Department place Mr. Nilsen's culpability on

3    equal footing with that of Hadis Nuhanovic, who received a sentence of 20 months, that

4    determination rests on a fundamental misunderstanding of Mr. Nilsen's role vis-à-vis his co-

5    defendants.  Far from playing a central role in coordinating the activities of his co-conspirators,

6    Mr. Nilsen was put on the frontlines of this scheme by more sophisticated moneyed players who

7    sought to distance themselves from potential criminal exposure by funneling bribe payments

8    through Mr. Nilsen.  Mr. Nilsen was paid the least, but risked the most.

9          In addition, both recommendations fail to account adequately for Mr. Nilsen's complex

10   and traumatic personal history, as well as the corresponding mental health conditions that

11   contributed to this illegal behavior.  As set out in full below, Mr. Nilsen endured horrific

12   physical and verbal abuse as a child, and, as an adult, experienced tragic personal loss followed

13   by years of a self-destructive substance addiction.  Indeed, his criminal conduct initiated while he

14   was trapped in a toxic work relationship that mirrored the abusive and traumatic relationship he

15   had with his own father.  A full forensic evaluation conducted for the purposes of sentencing

16   (which was not ready at the time of Probation's recommendation) confirms that Mr. Nilsen

17   suffers from post-traumatic stress disorder ("PTSD") and at-times debilitating anxiety disorder.

18   Prior to and during the scheme, Mr. Nilsen was extraordinarily vulnerable to manipulation,

19   haunted by years of trauma, and lacked the necessary tools to cope with stress and protect his

20   mental health.  Although in no way an excuse for Mr. Nilsen's conduct, his personal history and

21   psychiatric conditions are profoundly mitigating and explain how he came to be involved in the

22   offense.  Simply put, while Mr. Nilsen's co-defendants were motivated by greed, Mr. Nilsen

Defendant Joseph Nilsen's Sentencing Memorandum-2
*United States v. Nilsen, et al.,* No. CR20-151 RAJ

Justine A. Harris
Krista Staropoli
Sher Tremonte LLP
90 Broad St., Floor 23
New York, NY 10004

1   acted out of a desperate and misguided need for acceptance and respect.

2          But his trauma history is not the only basis to distinguish Mr. Nilsen from his co-

3   defendants.  A strong indicator of his fundamental character and desire to make amends is the

4   fact that Mr. Nilsen immediately accepted responsibility and engaged in fulsome cooperation

5   with the Government.  Unlike at least one of his co-defendants, Ed Rosenberg, who throughout

6   the case publicly derided the prosecution and Amazon, Mr. Nilsen quietly did the right thing.

7   Whatever the ultimate value of his assistance, detailed in the parties' §5K1.1 submissions, Mr.

8   Nilsen's thorough cooperation, together with his personal efforts at self-improvement, is the best

9   evidence that there is no risk of recidivism and no law enforcement need to impose a lengthy

10  sentence.

11         Moreover, unlike his co-defendants, any time in prison will be particularly harrowing for

12  Mr. Nilsen.  Over the past five years Mr. Nilsen has struggled with severe physical health

13  challenges, and given his complex medical needs, the BOP is unlikely to provide him with

14  appropriate medical care and mental health treatment.  In fact, a term of incarceration would be

15  contrary to the public interest, in that it will interrupt his substantial progress, undermine his and

16  Ms. Leccese's newfound stability, and risk life-threatening health complications.  While the need

17  to avoid unwarranted sentencing disparities is one factor, among several, that this Court must

18  consider, it is not the only one.  Ultimately sentencing is an "individualized assessment," and

19  here, imposing a 19-month sentence would be far greater than necessary to achieve the statutory

20  purposes of sentencing.  *Gall v. United States*, 552 U.S. 38, 50 (2007).

21         But for Mr. Nilsen's physical and mental health conditions, we would request that the

22  Court impose a term of incarceration of no greater than 10 months, 50% of the Probation

Defendant Joseph Nilsen's Sentencing Memorandum-3
*United States v. Nilsen, et al.,* No. CR20-151 RAJ

Justine A. Harris
Krista Staropoli
Sher Tremonte LLP
90 Broad St., Floor 23
New York, NY 10004

1    Department's recommendation.  But given Mr. Nilsen's extraordinary physical and mental health

2    challenges – among other things, he weighs close to 350 pounds – a term of incarceration would

3    be unduly harsh.  As the Sentencing Commission itself has recognized, "in the case of a seriously

4    infirm defendant, home detention may be as efficient as, and less costly than, imprisonment."

5    *See* USSG §5H1.4.  Accordingly, we respectfully request that the Court substitute any

6    contemplated term of imprisonment with a period of home confinement.

7            In support of our motion, we attach: (1) the August 25, 2023 forensic evaluation of Dr.

8    Robyn Landow ("Landow Report") (Exhibit A); (2) a letter from Mr. Nilsen to the Court

9    (Exhibit B); (3) letters from Mr. Nilsen's family members, including his mother, sisters, cousin

10   and future in-laws (Exhibit C); (4) letters from Mr. Nilsen's colleagues and business associates

11   (Exhibit D); (5) excerpts from Mr. Nilsen's medical  records (Exhibit E); (6) New York family

12   court records (Exhibit F); (6) excerpted communications from the record (Exhibit G).

13                                          **I.**
14                 **MR. NILSEN'S PERSONAL HISTORY AND CHARACTERISTICS**

15           A.      Mr. Nilsen's Childhood Was Marked by Domestic Violence and Instability

16           Joseph Nilsen was born on January 4, 1989, in Queens, New York to Olafur and Janet

17   Nilsen.  PSR ¶ 72.  Mr. Nilsen is the middle of three children; his sister Vanessa is five years

18   older, and his sister Brittany is two years younger.  *Id.*  Olafur was a unionized carpenter and

19   Janet a registered nurse.  *Id.*  The family rented the first floor of and lived in a small multi-family

20   clapboard house in a working-class neighborhood in Levittown, New York, where Mr. Nilsen

21   attended public school.  *Id.*

22           Mr. Nilsen's childhood home was neither stable nor safe.  PSR ¶ 73.  Olafur was an

23   alcoholic, used drugs, and likely suffered from untreated mental health issues.  Daily life was

Defendant Joseph Nilsen's Sentencing Memorandum-4                                    Justine A. Harris
*United States v. Nilsen, et al.,* No. CR20-151 RAJ                                  Krista Staropoli
                                                                                     Sher Tremonte LLP
                                                                                     90 Broad St., Floor 23
                                                                                     New York, NY 10004

1    marked by his unpredictable and violent outbursts that terrorized the family, instilled profound

2    fear in his children, and left long-lasting psychological scars on Mr. Nilsen.  *Id.*

3        Mr. Nilsen's mother was the primary target of his father's abuse.  Olafur repeatedly

4    threatened to kill Janet, threw whatever he could get his hands on, and broke household objects

5    big and small.  *See* Ex. F, Family Court Records, at 6.  As a child, Mr. Nilsen often witnessed his

6    father punching his mother and throwing her to the wall or ground.  Olafur frequently demeaned

7    and threatened Janet, and at one point screaming that he would "make OJ look like a saint if she

8    tried to keep the children from him."  *Id.*  His rage-fueled eruptions were regular, yet utterly

9    unpredictable, and thus Janet and the Nilsen children were constantly walking on eggshells,

10   fearing that some innocuous act would provoke a violent response.

11       Mr. Nilsen's father also directed his physical aggression at Mr. Nilsen personally, and his

12   attacks turned more and more sadistic, especially as Mr. Nilsen got older.  PSR ¶ 74.  On

13   multiple occasions, he threw large objects at Mr. Nilsen – once it was a rowing oar – often

14   hitting him.  Once, Mr. Nilsen's father put out a cigarette on Mr. Nilsen's arm.  Mr. Nilsen's

15   cousin, Corey Muniz, remembers Mr. Nilsen's father "beat[ing] Joey up" while their extended

16   family was on a family camping trip.  *See* Ex. C, Ltr. from Corey Muniz, at 7.  His sister,

17   Vanessa Nilsen, recalls her father choking the young Mr. Nilsen, picking him up by his neck, and

18   throwing him in his room because he could not explain why he was crying.  *Id.*, Ltr. from V.

19   Nilsen, at 2.  Given the regularity of the abuse, Mr. Nilsen himself cannot remember the number

20   of times he was shoved, slapped, and punched, but he does remember feeling constantly anxious,

21   always on guard for his father's next outburst.  Volatility was the only constant.

22       Two particularly violent incidents, when Mr. Nilsen remembers needing medical care, are

Defendant Joseph Nilsen's Sentencing Memorandum-5
*United States v. Nilsen, et al.,* No. CR20-151 RAJ

Justine A. Harris
Krista Staropoli
Sher Tremonte LLP
90 Broad St., Floor 23
New York, NY 10004

1   described in Dr. Landow's evaluation.  When Mr. Nilsen was approximately eight years old, he

2   accidentally broke the vacuum cleaner and was trying to fix it when his father picked him up and

3   threw him against a wall.  Mr. Nilsen recalls being in complete shock, and feeling "like

4   everything was broken," but does not recall what injuries he sustained or whether he was

5   admitted to the hospital.  *See* Ex. A, Landow Report, at 3.  When he was approximately twelve

6   years old, and trying to break up one of his parents' fights, his father elbowed him in the head,

7   knocking him unconscious.  Mr. Nilsen's cousin, Corey, accompanied Mr. Nilsen to the hospital,

8   where he was treated for a concussion, and released the same day.

9        As Mr. Nilsen got older, despite still being a child himself, he felt a deep-seated

10   obligation to protect his mother and his younger sister.  Not only did he – at his own physical

11   peril – try to protect his mother during his father's outbursts, Mr. Nilsen believed he could not

12   leave his mother alone for extended periods of time for fear that his father would hurt her in his

13   absence.  Mr. Nilsen's aunt, Cindy Muniz, recalls that Mr. Nilsen would never sleep over with

14   his cousins; "I honestly felt he was afraid to leave his mom alone with his dad, even at a very

15   young age."  *See* Ex. C, Ltr. of Cindy Muniz, at 19.  Mr. Nilsen was also desperate to protect his

16   younger sister, Brittany.  When his father's rages were particularly loud and frightening, Mr.

17   Nilsen would hole up in his room with Brittany for a "jam session," playing loud music in an

18   effort to drown out the sounds of his father's yelling, his mother's screaming, and the furniture

19   shattering.  *Id.*, Ltr. from B. Nilsen, at 4.

20        Janet made repeated efforts to separate from Mr. Nilsen's father, but it took years before

21   she was able to make a clean break.  As early as 1994, when Mr. Nilsen was only five years old,

22   she filed petitions in family court, reporting Olafur's violent behavior and attempts to drive while

Defendant Joseph Nilsen's Sentencing Memorandum-6
*United States v. Nilsen, et al.,* No. CR20-151 RAJ

Justine A. Harris
Krista Staropoli
Sher Tremonte LLP
90 Broad St., Floor 23
New York, NY 10004

1    drunk with their children in the car.  *See id.* at 4-5; Ex. F at 6.  Mr. Nilsen himself remembers

2    calling 911 on at least a half dozen occasions out of fear that his father would actually kill his

3    mother.  Child Protective Services ("CPS") came to the house because of complaints from

4    neighbors.  But despite the involvement of CPS and Family Court, Mr. Nilsen's father continued

5    to stalk, threaten, and terrorize his family.

6         Periodically, Mr. Nilsen's mother found the strength and resources to escape, on two

7    occasions moving out of the house with her three children and staying for several months with

8    friends and family.  PSR ¶ 75.  Janet eventually obtained a court order evicting Mr. Nilsen's

9    father from the family home, and the Sheriff's Department escorted Olafur out of the house,

10   permitting him to remove his belongings only if he was accompanied by a police officer.

11        Following the separation, Mr. Nilsen's father continued to harass the family; as late as

12   December 2002, he was still stalking the home, threatening to hurt Mr. Nilsen's mother if she

13   reported his violations of the protective order.  Yet, despite his father's violence and mental

14   instability, Mr. Nilsen's mother still allowed him to visit with the children.  When it became

15   clear that Olafur was often drunk and high on those visits – and worse, sometimes getting behind

16   the wheel with the children in the car – the visits had to be supervised by social workers. PSR

17   ¶ 74.  For years, Mr. Nilsen and his sisters only saw their father at a facility monitored by metal

18   detectors and uniformed officers.  There were staggered exit times to ensure that Mr. Nilsen did

19   not follow the children when they left, and cards and gifts were inspected by security officers.

20        Although home life was safer without Mr. Nilsen's father, his mother struggled

21   financially.  PSR ¶ 76.  She took extra nursing shifts to make ends meet, yet sometimes still did

22   not have enough money to stock the refrigerator or buy new clothes and shoes for the children.

Defendant Joseph Nilsen's Sentencing Memorandum-7                    Justine A. Harris
*United States v. Nilsen, et al.,* No. CR20-151 RAJ                 Krista Staropoli
                                                                    Sher Tremonte LLP
                                                                    90 Broad St., Floor 23
                                                                    New York, NY 10004

1    *Id.*  The financial problems created additional anxieties for Mr. Nilsen and his sisters.  Brittany

2    recalls that while their mother tried to make ends meet, there were "some very difficult times

3    financially."  *See* Ex. C at 5.  At one point, their home phone service was cut off; on another, the

4    school lunch check bounced.  After school, with their mother often out working late, Mr. Nilsen

5    cared for Brittany, and developed basic culinary skills to make her dinners from pantry staples

6    and whatever condiments were in the fridge.

7            As adults, Mr. Nilsen's sisters have tried to repair their relationship with their father.

8    While they have encouraged Mr. Nilsen and his father to reconcile, whenever Mr. Nilsen makes

9    an effort, his father's communications quickly devolve into angry – yet sadly familiar – tirades.

10   In fact, Mr. Nilsen has kept voicemails from his father from 2016, 2019, and 2022, in which his

11   father unleashes vitriol on Mr. Nilsen, calling him vulgar names and threatening to kill him.  In

12   the three voicemails Mr. Nilsen has saved in his archives, his father calls him a "little f--ing cunt

13   bitch," a "f--king twat," "f--king pussy ass, f--king crackhead," "f--king little faggot, little queer

14   bitch."  His father tells him he is "coming for him," is "going to "f--king beat the f--ck out of

15   [him]," and that he "f--ked with the wrong mother f--ker."  *See, e.g.*, Ex. G, Transcript from

16   2016 Voicemail.  After the last series of voicemails, Mr. Nilsen, for his own well-being, finally

17   blocked his father from further communicating with him.

18           B.      Mr. Nilsen's Efforts to Find Stability and His Struggle with Opioid Addiction

19           While Mr. Nilsen initially excelled in school, he struggled to find his footing in high

20   school; he had a hard time focusing on subjects that did not interest him.  PSR ¶ 77.

21   Nevertheless, upon his graduation in 2007, he earned a scholarship to the prestigious French

22   Culinary Institute in New York City.  After graduating from the nine-month program, Mr. Nilsen

Defendant Joseph Nilsen's Sentencing Memorandum-8
*United States v. Nilsen, et al.,* No. CR20-151 RAJ

Justine A. Harris
Krista Staropoli
Sher Tremonte LLP
90 Broad St., Floor 23
New York, NY 10004

1    spent two years working at a variety of high-end New York City restaurants, including Jean-

2    Georges, Craft and Per Se.  PSR ¶ 78.  As much as Mr. Nilsen found satisfaction in the work he

3    was doing, he learned quickly that the restaurant industry – particularly in Manhattan – involved

4    high stress and little pay.  Beyond that, Mr. Nilsen long dreamed of having a family, and it did

5    not seem possible so long as he stayed in Manhattan's high-end restaurant business.

6            The realization that the career Mr. Nilsen had been pursuing for years was at odds with

7    one of the most important things he wanted out of life was disappointing, and in 2010, he moved

8    back to his hometown and began working as the head chef at a restaurant in Huntington, Long

9    Island.  PSR ¶ 79.  Unfortunately, Mr. Nilsen was in over his head, and struggled to meet the

10   demands of his work.  During this time, Mr. Nilsen reconnected with his childhood friends,

11   many of whom had become regular users of Percocet.  Mr. Nilsen began using opiates too,

12   believing that they got him through his long workdays.  Mr. Nilsen's best friend from home, Paul

13   Fontana, who had also gone to culinary school, began working with Mr. Nilsen.  Mr. Nilsen and

14   Mr. Fontana spent all of their time together, using drugs while working side by side at the

15   restaurant.

16           Mr. Nilsen's use of Percocet quickly spiraled into a full-fledged addiction.  Within six

17   months of returning to Long Island, Mr. Nilsen was taking Roxicodone (or "Roxies") – a rapid

18   onset opiate that provides a similar feeling to heroin – daily.  When the restaurant closed due to

19   Superstorm Sandy in November 2012, Mr. Nilsen and Mr. Fontana made money by cutting wood

20   from fallen trees.  After one long day of work, Mr. Fontana stayed with Mr. Nilsen at Mr.

21   Nilsen's mother's home and, before going to sleep, both crushed and snorted Roxies.  PSR ¶ 80.

22   The next morning, Mr. Nilsen walked across the room and tried to shake Mr. Fontana awake so

Defendant Joseph Nilsen's Sentencing Memorandum-9
*United States v. Nilsen, et al.,* No. CR20-151 RAJ

Justine A. Harris
Krista Staropoli
Sher Tremonte LLP
90 Broad St., Floor 23
New York, NY 10004

1    they could meet their tree cutting appointment in time, but Mr. Fontana was unresponsive. *Id.*

2    Mr. Nilsen saw blood on his face and pillow – Mr. Nilsen's best friend had overdosed and died.

3    *Id.*

4           Mr. Fontana's death sent Mr. Nilsen into a tailspin.  While Mr. Nilsen had already faced

5    tremendous adversity in his life, the grief over his friend's death felt to him like the absolute rock

6    bottom.  He began frantic efforts to get clean.  In 2012 and 2013, Mr. Nilsen was in and out of at

7    least a half dozen detox programs and rehab centers, but initial efforts at sobriety did not stick,

8    and, still struggling with his profound grief over Paul's death, Mr. Nilsen repeatedly relapsed,

9    prompting his friends to reject him.  Overwhelmed by hopelessness and a lack of control over his

10   addiction, Mr. Nilsen felt he had nowhere to turn and found himself homeless in Philadelphia for

11   twenty-eight days.  Frustrated and disappointed with what he perceived to be his failure, Mr.

12   Nilsen found the courage to try again, and sought out and completed additional rehab programs

13   in Long Island, knowing he would seek a fresh start in another place when he was through.

14          It was during this time that Mr. Nilsen was arrested and charged with misdemeanor drug

15   possession.  PSR ¶ 65.  After completing a thirty-day rehab and detox program in Long Island in

16   August 2013, Mr. Nilsen was driving to a sober living house in York, Pennsylvania when he was

17   pulled over for making an illegal U-turn.  The police searched Mr. Nilsen's car and found a straw

18   with drug residue on it – no drugs were found.  Mr. Nilsen was detained and charged with intent

19   to possess a prescription drug without authorization and possession of drug paraphernalia.  He

20   was released from custody within a few hours and continued to the sober living facility, where he

21   tested negative for drugs and was admitted.  While Mr. Nilsen's memory of these events is far

22   from clear, court records show that Mr. Nilsen pled guilty to the misdemeanor charges by

Defendant Joseph Nilsen's Sentencing Memorandum-10
*United States v. Nilsen, et al.,* No. CR20-151 RAJ

Justine A. Harris
Krista Staropoli
Sher Tremonte LLP
90 Broad St., Floor 23
New York, NY 10004

1    telephone several months later when he was at Benchmark Recovery Center, a long-term rehab

2    program in Texas.

3          Mr. Nilsen credits Benchmark, where he stayed from late January 2014 to September

4    2014, with saving his life.  Benchmark required a long-term commitment and encouraged

5    fundamental changes in behavior.  During the transformative months he spent at Benchmark,

6    "[Mr. Nilsen] worked hard and showed determination to begin living a new way of life, free of

7    drugs and alcohol."  *See* Ex. D, Ltr. of L. Rust, at 4.  During this period of healing, Mr. Nilsen

8    tended to relationships that had suffered as a result of his addiction and reflected on how feelings

9    of inadequacy and fear of failure had fueled his substance abuse.  Mr. Nilsen has remained sober

10   ever since.  As Lane Rust, the Director of Benchmark, writes in his attached letter, "Joe has

11   expressed his gratitude consistently over the course of the last ten years, which is an indicator

12   that his experience was truly life changing."  *Id.*

13         C.       Mr. Nilsen's Entry into E-Commerce Business

14         Mr. Nilsen returned to Long Island in late 2014 and began working at a restaurant in

15   Long Beach.  It was around this time that he mustered the courage to reach out to Kristen

16   Leccese, with whom he previously worked, and the two began dating.  PSR ¶ 81.  Ms. Leccese is

17   now his fiancée.  *Id.*  While working at the restaurant, Mr. Nilsen started a side business of

18   selling used textbooks through Amazon.  *Id.*  After six months, he was busy enough with the

19   business that he transitioned to that job full-time.  For the first time in a long time, things were

20   looking up.

21         It is through his fledgling used textbook business that Mr. Nilsen learned firsthand about

22   the challenges faced by third-party sellers.  Eager to learn more about this sector, and after losing

Defendant Joseph Nilsen's Sentencing Memorandum-11                                    Justine A. Harris
*United States v. Nilsen, et al.,* No. CR20-151 RAJ                                    Krista Staropoli
                                                                                       Sher Tremonte LLP
                                                                                       90 Broad St., Floor 23
                                                                                       New York, NY 10004

his textbook inventory, Mr. Nilsen found a job working for an attorney, Cory Rosenbaum, who purported to assist suspended Amazon sellers recover their accounts. *Id.* Mr. Rosenbaum hired Mr. Nilsen to facilitate the launch of a new consulting firm in exchange for 10% of all the profits that came from non-legal fees. With Mr. Nilsen's help, Mr. Rosenbaum's business grew quickly; Mr. Nilsen was busy and enjoyed the steep learning curve. Although Mr. Rosenbaum recognized Mr. Nilsen's significant contributions, he never followed through on the partnership stake commitment. Mr. Nilsen grew frustrated and, after ten months, quit to pursue an opportunity to work with one of Mr. Rosenbaum's friend, former fraternity brother, and client, Mr. K.,[1] and Mr. K.'s large online selling company. PSR ¶ 82.

At first, Mr. Nilsen looked up to Mr. K., who presented as charismatic and successful. Mr. Nilsen was impressed by his company's rapid growth, and the job made Mr. Nilsen feel valued at a particularly challenging time in his life. But Mr. K. quickly identified and exploited Mr. Nilsen's emotional vulnerability, and, over several years, engaged in a variety of conduct designed to exert control over Mr. Nilsen and Ms. Leccese. For example, despite both Mr. Nilsen and Ms. Leccese working 70 hours each week, Mr. K. never paid them a consistent amount. Unlike Mr. Rosenbaum, who paid them a total of $700 a week, Mr. K. would wait until Mr. Nilsen and Ms. Leccese could not afford basic necessities, and then provide whatever amount they needed to get by – never enough to feel financially secure. This erratic compensation made it functionally impossible to make ends meet, and just when Mr. Nilsen and Ms. Leccese were on the brink of insolvency, Mr. K. would offer to pay an outstanding bill or send them a one-time payment.

---

[1] Because there are sensitivities surrounding the identity of this individual, he is referred throughout to "K."

Defendant Joseph Nilsen's Sentencing Memorandum-12
*United States v. Nilsen, et al.,* No. CR20-151 RAJ

Justine A. Harris
Krista Staropoli
Sher Tremonte LLP
90 Broad St., Floor 23
New York, NY 10004

1       Mr. K.'s manipulative tactics were not limited to money.  He insisted on secrecy when

2  communicating, requiring Mr. Nilsen and Ms. Leccese to text with him over Confide, an

3  encrypted messaging platform where messages "self-destruct" immediately after being read;

4  when messages were sent by email or regular text, he often asked for proof that they were

5  subsequently deleted.  He also made a point of sharing what had happened to once-loyal business

6  associates who had betrayed him, and there were whispers around the warehouse of his

7  connections to organized crime.  In fact, Mr. K. told Mr. Nilsen that he had wiretapped Mr.

8  Rosenbaum's home, because Mr. K. suspected he was acting against his interest.  As proof, Mr.

9  K. patched in a live feed from what appeared to be Mr. Rosenbaum's home, where Mr. Nilsen

10  overheard personal communications between Mr. Rosenbaum and his wife.  On the few

11  occasions when Mr. Nilsen and Ms. Leccese summoned the courage to quit, or disagreed with an

12  unreasonable demand, they were subjected to narcissistic tirades, in which Mr. K. accused them

13  of ingratitude and discredited their years of hard work.  *See* Ex. G, Text Message Between Mr.

14  K. and J. Nilsen ("Nobody has given you more time and energy in backing than me. I do not

15  want to hear about your f--ing network of people that you're going to do this and that with which

16  you would not have if I did not support you through the last f--ing four years. We are in this

17  TOGETHER.").  Sadly, for Mr. Nilsen, fear, anxiety, and hypervigilance came to dominate his

18  work, just as those emotions had dominated much of his childhood.

19       Soon after starting with Mr. K., Mr. Nilsen and Ms. Leccese were forced to work on the

20  side to make ends meet.  Knowing that Mr. K. would not allow any work that was unconnected

21  to his company, they secretly started their own side business, eager to meet the demands of the

22  market to keep their heads above water.  Mr. K. had created the company Digital Checkmate in

Defendant Joseph Nilsen's Sentencing Memorandum-13
*United States v. Nilsen, et al.,* No. CR20-151 RAJ

Justine A. Harris
Krista Staropoli
Sher Tremonte LLP
90 Broad St., Floor 23
New York, NY 10004

1    Mr. Nilsen's name so that Mr. K.'s bribe payments to Amazon insiders in India could not be

2    traced to him; he filled out the paperwork and told Mr. Nilsen what accountants to use.   PSR

3    ¶ 82.  When Mr. Nilsen and Mr. Leccese began their own third-party consulting work, they did it

4    under the Digital Checkmate umbrella. Much of this work was lawful; like Mr. Rosenberg, they

5    wrote plans of actions ("POAs") and had designed software to assist 3P sellers legitimately

6    reconcile their accounts.  However, much of it was not, and it is during this time period that Mr.

7    Nilsen and Ms. Leccese became deeply entrenched in the bribery scheme and related illegal

8    conduct described in the indictment.

9         Toward the end of 2019, Mr. Nilsen and Ms. Leccese were finally able to extract

10   themselves from the toxic relationship with Mr. K.  He and Ms. Leccese could no longer handle

11   the stress and the anxiety.  Mr. K. did not handle Mr. Nilsen's departure well – as he had done

12   before, he threatened, insulted, and harassed Mr. Nilsen for months.  The onset of the COVID-19

13   pandemic brought a respite, and the harassing communications from Mr. K. slowed and then

14   ceased by the spring of 2020.  But even then, Mr. Nilsen remained extraordinarily fearful.  As

15   described in Dr. Landow's report, he had a surveillance system installed at his apartment, and

16   once called 911 when Ms. Leccese was coming home, mistakenly thinking she was an intruder.

17   When FBI agents, with guns drawn, forced open Mr. Nilsen's door at 6 a.m. only a few months

18   later, Mr. Nilsen was relieved that it was law enforcement, rather than Mr. K. and his associates.

19        D.    Mr. Nilsen's Mental Health Diagnoses

20        Dr. Robyn Landow, a New York State licensed psychologist who treated Mr. Nilsen

21   intermittently in the years since his arrest, prepared a psychological evaluation in connection

22   with sentencing.  Based on her over 35 hours of meetings with Mr. Nilsen, Dr. Landow

Defendant Joseph Nilsen's Sentencing Memorandum-14
*United States v. Nilsen, et al.,* No. CR20-151 RAJ

Justine A. Harris
Krista Staropoli
Sher Tremonte LLP
90 Broad St., Floor 23
New York, NY 10004

1    concludes that he is suffering from PSTD, generalized anxiety disorder, and opioid use disorder

2    in sustained remission.  *See* Ex. A at 11.  Because "he experienced significant physical abuse at

3    the hands of his father and witnessed regular incidents of domestic violence against his mother,"

4    he has experienced all of the diagnostic criteria of PTSD "to some degree, since he was a child."

5    *Id.*  These symptoms include intrusive and unwanted flashbacks, overly negative thoughts and

6    exaggerated self-blame, and difficulty concentrating or sleeping.

7          Mr. Nilsen's PTSD is exacerbated by his anxiety disorder, which Dr. Landow noted has

8    "significant behavioral manifestations, including restlessness, social withdrawal/isolation, and an

9    uneven and weak vocal style marked by stuttering and a lack of fluency." *Id.* at 11-12.  Indeed,

10   impaired by these conditions, and "fragile psychologically," Mr. Nilsen had poor coping skills

11   for responding to stress.  *Id.* at 13.  His "survival mentality meant trusting no one and never

12   asking for help[.]   In an effort to protect and provide for himself and those he loves, [Mr. Nilsen]

13   responded to crisis situations by avoiding danger and trying to fix things himself." *Id.* at 12.  As

14   is often the case with individuals who endured severe childhood abuse, Mr. Nilsen's PTSD and

15   anxiety "have had a lasting impact on his life, shaping his 'fight or flight' reactions and decision-

16   making in ways that are deeply influenced by his past traumas." *Id.* at 13.

17          E.    Mr. Nilsen's Serious and Debilitating Medical Conditions

18          Mr. Nilsen's involvement in the offense coincided with a series of health crises, and Mr.

19   Nilsen now suffers from serious medical conditions that he struggles to manage on a daily basis.

20   These include morbid obesity, hypertension, insulin resistance, sleep apnea, a history of pleural

21   effusion, and chronic vein insufficiency.  *See* Ex. E, Primary Care Physician Report, at 77-78.

22          Mr. Nilsen's medical problems began in March 2017.  Mr. Nilsen sought treatment at

Defendant Joseph Nilsen's Sentencing Memorandum-15
*United States v. Nilsen, et al.,* No. CR20-151 RAJ

Justine A. Harris
Krista Staropoli
Sher Tremonte LLP
90 Broad St., Floor 23
New York, NY 10004

1    Plainview Hospital for abdominal pain, shortness of breath, and pain in his left flank.  He was

2    diagnosed with atelectasis (a complete or partial collapse of the lung) and peripheral edema,

3    which was initially treated with antibiotics. *Id.*, Discharge Note, at 8.  Less than a month later,

4    on April 3, 2017, Mr. Nilsen found himself back at Plainview, requiring further medical attention

5    for the same symptoms.  This time he was hospitalized and treated for mycoplasma pneumonia,

6    empyema (a collection of pus in the space between the lung and the inner surface of the chest

7    wall), and pleural effusion (a buildup of fluid between the layers of tissue that line the lungs and

8    chest cavity and prevent the lungs from fully inflating), which required the administration of a

9    thoracentesis, or a pleural tap (a procedure that involves draining excess fluids from around the

10    lungs by inserting a needle through the chest wall into the pleural space). *Id.*, Pleural Infusion

11    Note, at 31-34.  Despite treatment, Mr. Nilsen's symptoms persisted, leading to a third

12    hospitalization on April 14, and a second pleural tap on April 15. *Id.*, Procedures Summary, at

13    68-71.  Finally, on April 19, 2017, Mr. Nilsen underwent emergency cardiothoracic surgery, a

14    video-assisted procedure during which the surgeon partially drained the lungs of fluid and

15    inserted a chest tube through the inferior port to re-insufflate his lung. *Id.* at 50. While Mr.

16    Nilsen had no choice but to undergo this life-saving surgery, the recovery has been long and

17    painful.

18         The most immediate consequence of Mr. Nilsen's 2017 lung problems, and perhaps an

19    unintended consequence of the surgery, was Mr. Nilsen's sudden and unexplained weight gain.

20    In the months following the surgery, Mr. Nilsen gained approximately 170 pounds – taking him

21    from a healthy 180 pounds to, at his heaviest, 375 pounds, with a BMI of 52.2.  Although Mr.

22    Nilsen sought guidance from his primary care physician, endocrinologist, cardiologist, multiple

Defendant Joseph Nilsen's Sentencing Memorandum-16
*United States v. Nilsen, et al.,* No. CR20-151 RAJ

Justine A. Harris
Krista Staropoli
Sher Tremonte LLP
90 Broad St., Floor 23
New York, NY 10004

1    vascular surgeons, and pain management doctor, no doctor was able to determine why this was

2    happening to him; some opined that he had hypothyroidism, others attributed Mr. Nilsen's

3    weight gain to lifestyle choices, even though he had not changed his diet or eating habits at all.

4    PSR ¶ 86.  Indeed, until recently, no treatment – medical or otherwise – had been effective at

5    curbing his weight.  Mr. Nilsen is considered morbidly obese.

6         With obesity, of course, comes a host of other complications.  Over the last several years,

7    Mr. Nilsen has also developed hypertension – his blood pressure routinely clocks in at over

8    160/100, even on medication – venous insufficiency, peripheral edema, insulin resistance,

9    gastroesophageal reflux disease, obstructive sleep apnea, prediabetes, and arrythmia.  To help

10    address these chronic concerns, Mr. Nilsen is currently prescribed seven different medications,

11    which he takes daily.  *See* PSR ¶ 87.

12         On top of these problems, since 2018, Mr. Nilsen has endured lower extremity edema

13    thought to be caused by chronic veinous insufficiency, a medical condition in which the veins,

14    primarily in the legs, fail to efficiently return blood to the heart, leading to pooling of blood that

15    over time manifests in leg pain, swelling, skin discoloration, and skin ulcers.  Because of the pain

16    and swelling, Mr. Nilsen struggles every morning before standing up – it sometimes takes him 8-

17    10 minutes before he is stable on his feet.  Some days it is painful for him to walk more than a

18    block, and he can't stand for extended periods without his legs giving out.  Nearly every day, Mr.

19    Nilsen has to lie horizontally to elevate his legs for at least a half-hour within four to six hours of

20    waking because he simply cannot sit or stand upright any longer.  The severity of the condition is

21    best understood visually, and these photographs depict his legs in 2018 and 2022.

22                  *Mr. Nilsen's legs in October 2018*

Justine A. Harris
Krista Staropoli
Sher Tremonte LLP
90 Broad St., Floor 23
New York, NY 10004



1

2

3

*Mr. Nilsen's legs in July 2022*

  

5

6       While Mr. Nilsen was diagnosed with chronic venous insufficiency in both legs in 2018,

7    *Id*., Lower Venous Examination Results, at 73, Mr. Nilsen's financial situation and lack of

8    insurance prohibited him from seeking what all of the doctors said he needed – a surgical

9    procedure in which a laser is used to seal the "dead" veins that are blocking blood from flowing

10    back to the heart from the feet.  Now that he has medical insurance, and hoping to take care of

11    the procedure before sentencing, Mr. Nilsen recently consulted Dr. Michael F. Gioscia, a

12    vascular surgeon, expecting to schedule the surgery before sentencing.  But Dr. Gioscia, a Board-

Defendant Joseph Nilsen's Sentencing Memorandum-18
*United States v. Nilsen, et al.,* No. CR20-151 RAJ

Justine A. Harris
Krista Staropoli
Sher Tremonte LLP
90 Broad St., Floor 23
New York, NY 10004

1    Certified surgeon at the Vein Institute of Westchester, does not believe that Mr. Nilsen in fact

2    has CVI, but rather diagnosed him with lymphedema – chronic tissue swelling caused by an

3    accumulation of protein-rich fluid that is usually drained through the body's lymphatic system.

4    *See Lymphedema Overview*, Mayo Clinic, https://www.mayoclinic.org/diseases-

5    conditions/lymphedema/symptoms-causes/syc-20374682.  Untreated, the condition can lead to

6    skin infection, sepsis, blistering, skin thickening, and in severe cases, a rare form of soft tissue

7    cancer.  There is no cure for lymphedema, but the condition can be maintained with specialized

8    therapy including manual lymphatic drainage (MLD) and the specific use of muscles for lymph

9    drainage.[2]  Mr. Nilsen has been referred to a therapy facility only 2.4 miles from his apartment

10   and he is eagerly waiting for the first intake appointment.

11          In recent months, Mr. Nilsen has also finally started to see some improvement in his

12   weight.  Beginning in July 2023, he started receiving weekly Tirzepatid injections, a drug used to

13   lower blood sugar and shown to be useful in weight loss.  He has lost over 20 pounds in the last

14   six weeks.  PSR ¶ 86.

15          F.      Mr. Nilsen's Post-Offense Rehabilitation

16          In the aftermath of the raid on his apartment, Mr. Nilsen's life unraveled further.  At the

17   time of the indictment, he and Ms. Leccese were broke, and, still afraid of Mr. K., his anxiety

18   spiraled.  Although Mr. Nilsen tried to secure freelance work by advertising his digital marketing

19   services, finding clients proved difficult, and he and Ms. Leccese struggled more than ever.

20   Reluctantly, they accepted loans from Mr. Nilsen's sister, and Ms. Leccese's parents – but it was

---

[2]      "Phase I of Lymphedema Therapy consists of the mobilization of fluid and the initiation of a decrease in the proliferated connective tissue. To achieve maximum effectiveness or significant results, it is highly recommended for patients to be treated at least 5 times per week, 1 session per day for several weeks." https://www.physio-pedia.com/Complete_Decongestive_Therapy_(CDT).

Defendant Joseph Nilsen's Sentencing Memorandum-19
*United States v. Nilsen, et al.,* No. CR20-151 RAJ

Justine A. Harris
Krista Staropoli
Sher Tremonte LLP
90 Broad St., Floor 23
New York, NY 10004

1    not enough.  At times they could not put food on the table, and in April 2022, they were evicted

2    from their apartment.  Mr. Nilsen, once again, felt totally defeated.

3        Although the future appeared bleak, Mr. Nilsen channeled his remaining energy into self-

4    improvement and focused on developing additional computer skills that would better position

5    him for new opportunities.  As he has done in the past, Mr. Nilsen sought out and completed a

6    variety of classes through Data Camp, an online learning platform that offers courses in data

7    science, machine learning, and artificial intelligence.  Mr. Nilsen also earned certificates of

8    completion in a variety of Google courses, including Google Analytics, Google Ads-

9    Measurement, and Google Shopping ads.

10        Capitalizing on his enhanced understanding of AI and machine learning, Mr. Nilsen

11    began work on various software ideas, and ultimately created a program to identify fraudulent

12    negative reviews with high statistical probability. PSR ¶ 99. With the software fully developed,

13    in August 2022, Mr. Nilsen and Ms. Leccese entered into a joint venture to create TraceFuse, a

14    company that utilizes this new technology to assist third-party sellers protect themselves from

15    marketplace abuse.  By all accounts, this business venture is filling a need in the Amazon sector.

16    *See* Dharmesh Mehta, *A blueprint for private and public sector partnership to stop fake reviews*,

17    Amazon (June 13, 2023), https://www.aboutamazon.com/news/policy-news-views/how-amazon-

18    is-working-to-stop-fake-reviews ("The private sector, consumer groups, and governments need

19    to work together to stop these fake review brokers and send a clear message that this illicit

20    activity must stop.").[3]

21        The company has generated revenue, and Mr. Nilsen and Ms. Leccese have finally been

Defendant Joseph Nilsen's Sentencing Memorandum-20
*United States v. Nilsen, et al.*, No. CR20-151 RAJ

Justine A. Harris
Krista Staropoli
Sher Tremonte LLP
90 Broad St., Floor 23
New York, NY 10004

1    able to pay their outstanding debts and get back on their feet.  Today, TraceFuse employs 26

2    people.  Mr. Nilsen is integral to the business and appreciated by his employees.  One employee,

3    Akram Taha, has written to the Court, explaining how grateful he is for the opportunity to work

4    with Mr. Nilsen: "Joe has become my mentor in both life and work. He has shown me how to be

5    more patient, more focused, and how to stay organized to really make the most of the skills I

6    have." *See* Ex. D, Ltr. of A. Taha, at 6.  In his attached letter, Mr. Nilsen's business partner

7    explains that it is Mr. Nilsen's knowledge, skill and innovation that keeps the business running –

8    "frankly, without [Mr. Nilsen], this business would not have the ability to run at all." *Id.,* Ltr of.

9    S. Barker, at 2.

10       Mr. Nilsen has also spent the last several years reconnecting and making amends with his

11   family.  This was paramount for Mr. Nilsen, who has always wanted a stable family of his own,

12   and who, since childhood, has "live[d] and breathe[d] for his two sisters." *See* Ex. C, Ltr. of V.

13   Nilsen, at 2.  Notably, Mr. Nilsen has been able to meaningfully step into a supporting role for

14   his younger sister, Brittany, who was diagnosed with rheumatoid arthritis and more recently,

15   with stage 2 grade 3 breast cancer.  Even when Mr. Nilsen's life was in disarray, he made it a

16   priority to be a part of his sister's support team.  Upon learning about his sister's autoimmune

17   disease, Mr. Nilsen researched what the best diet was, cooked specialized recipes, portioned out

18   and froze the food, and delivered them to his sister each week.  *Id*.  When Brittany was

19   diagnosed with breast cancer last year, Mr. Nilsen once again stepped up.  Finally solvent, Mr.

20   Nilsen has sent his sister as much money as he can spare, meaningfully subsidizing her cancer

21   treatment, which she cannot afford on her own.  *Id*. at 6. ("His emotional and financial support

22   have impacted my journey in a way that I can hardly put into words. There is no doubt that the

Defendant Joseph Nilsen's Sentencing Memorandum-21
*United States v. Nilsen, et al.,* No. CR20-151 RAJ

Justine A. Harris
Krista Staropoli
Sher Tremonte LLP
90 Broad St., Floor 23
New York, NY 10004

1    loss of his support he has provided will impact my ability to keep fighting this battle as I have.").

2    Mr. Nilsen's financial support is not where his care for his sister ends.  On an almost daily basis,

3    Mr. Nilsen sends her uplifting messages and words of inspiration and assurance.  True to form,

4    Mr. Nilsen tries hard to be the rock for his sisters, and his devotion does not go unnoticed.  Mr.

5    Nilsen's older sister, Vanessa, puts it best: "Joey always says[,] 'family first,' and he has lived by

6    that every[]day of his life."  *Id.* at 3.

7          Not only is Mr. Nilsen now thriving in his work life and tending to important personal

8    relationships, but he has used the last few years on pretrial supervision to engage in profound

9    self-reflection and unlearn the poor behavioral mechanisms that have been hard-wired since

10   childhood.  This began with Mr. Nilsen prioritizing his mental health.  Since the indictment, Mr.

11   Nilsen has engaged in regular therapy with Dr. Landow (but for a break in 2022 when he could

12   not afford the sessions).  Through this work, he has begun to "develop[] cognitive and behavior

13   tools that have brought about a reduction in distressing symptoms, enhanced self-awareness, a

14   heightened sense of empowerment, and increased resiliency."  *See* Ex. A at 12.  As Dr. Landow

15   explains, given the "extent to which he now understands his past behavior, combined with his

16   motivation to engage in treatment, his prognosis for improving his level of psychological

17   functioning and maintaining a positive course is excellent."  *Id.* at 14.  Equally important, Mr.

18   Nilsen is taking a more proactive approach to his physical health.  Now fully insured, Mr. Nilsen

19   has found tools to curb his unhealthy weight and is seeking real answers to his chronic leg

20   problems.

21         Mr. Nilsen's hard-earned turnaround is confirmed in the letters from his family and

22   friends. Mr. Nilsen's cousin, Mr. Muniz, is heartened by Mr. Nilsen's progress: "Over the past

Defendant Joseph Nilsen's Sentencing Memorandum-22
*United States v. Nilsen, et al.,* No. CR20-151 RAJ

Justine A. Harris
Krista Staropoli
Sher Tremonte LLP
90 Broad St., Floor 23
New York, NY 10004

1    year, I have seen a noticeable transformation in Joey's attitude and behavior.  He has actively

2    engaged in self-reflection and sought guidance from my family including myself to help him

3    address the root of his past mistakes that led him into trouble. I honestly believe that Joey is

4    taking all the right steps in becoming the man we all know him to be." *See* Ex. C, Ltr. of Corey

5    Muniz, at 8.  Ms. Leccese's parents, Donna and John Leccese, have witnessed Mr. Nilsen's work

6    ethic up close.  In their view, Mr. Nilsen "has always believed in a better life ahead and

7    continues to demonstrate that mantra every day." *Id.*, Ltr of D. Leccese, 15.  John Leccese, an

8    engineer with the U.S. Defense sector for over 40 years, has come to have enormous respect for

9    Mr. Nilsen: "Joe is a genuinely good person who has done everything he can to rectify the harm

10   he has done and build a better life for him and my daughter." *Id.*, Ltr. of J. Leccese, at 17.  With

11   a renewed optimism for the future, Mr. Nilsen proposed to Ms. Leccese at the end of August

12   2021, and, depending on the outcome of sentencing, the two hope to be married in 2024.  Donna

13   and John are "thrilled to welcome Joe into [their] family." *Id.* at 15.

14                                              **II.**
15   **THE CIRCUMSTANCES OF THE OFFENSE AND MR. NILSEN'S RELATIONSHIP**
16                        **TO HIS CO-DEFENDANTS**

17          Mr. Nilsen takes full responsibility for his wrongful conduct.  The details of his crimes

18   are set out at length in the plea agreement, as well as the Presentence Report.  *See* Plea

19   Agreement ¶ 9; PSR ¶ 11-36.  Between 2017 and 2020, Mr. Nilsen paid commercial bribes to

20   Amazon employees and contractors to obtain confidential business information that he and

21   others used to reinstate suspended 3P Amazon accounts.[4] PSR ¶ 30. The Plans of Actions

---

[4]      Mr. Nilsen primarily obtained "annotations" – internal reports that explain why a seller account had been suspended.  Amazon now shares the reasons for suspension directly to the third-party seller via a seller dashboard. He also on occasion obtained "wikis" and standard operating procedures (SOPs). PSR ¶ 24. While the PSR

Defendant Joseph Nilsen's Sentencing Memorandum-23
*United States v. Nilsen, et al.,* No. CR20-151 RAJ

Justine A. Harris
Krista Staropoli
Sher Tremonte LLP
90 Broad St., Floor 23
New York, NY 10004

(POAs) submitted by Mr. Nilsen and others often contained false statements or were supported by false documents.  Mr. Nilsen also bribed Amazon insiders to assist his clients and the clients of co-conspirators in circumventing other Amazon rules, including: the inventory requirements for FBA (Fulfillment by Amazon) and the invoice and documentation required to sell goods in restricted product categories.[5]  Further, Mr. Nilsen, for both himself and others (including Mr. K. and Mr. Nuhanovic), engaged in a scheme to submit false reimbursement requests to Amazon, whereby an insider would remove tracking information from Amazon's records so that when their clients submitted reimbursement requests, Amazon had no documentation to dispute the claims.  As a result, Amazon was induced to pay out approximately $40,000, of which $12,300 or less went to Mr. Nilsen.  Finally, for approximately a nine-month period, Mr. Nilsen and Ms. Leccese also sold supplements as a third-party seller.  While Mr. Nilsen never sold supplements that he believed to be dangerous to consumers, he did sell the products through fraudulent third-party seller accounts created by Mr. Nuhanovic.

During the conspiracy, Mr. Nilsen worked primarily with two insiders at Amazon: Rohit Kadimisetty and then Nishad Kunju.  Contrary to Probation's allegation that "Mr. Nilsen obtained Amazon's internal information by personally paying bribes and directing others to do so on his behalf," PSR ¶ 31, the vast majority of the bribes Mr. Nilsen facilitated were on behalf of Mr. Rosenberg's clients, who, for obvious reasons, chose to funnel illegal bribe payments

---

suggests that individuals in the conspiracy also obtained "proprietary algorithms related to the Amazon Marketplace search engine," and "'buy boxes' product listings," neither Mr. Nilsen nor Ms. Leccese ever obtained such information.  They are also not aware of anyone else who did.

[5]      Paragraph 28.k. of the indictment suggests that Mr. Nilsen imperiled unsuspecting Amazon consumers by working to reinstate a product suspended as an "unapproved medical device."  Dkt. No. 1.  This single instance refers to the sale of a heated blanket; this exact product (ASIN B077Y2Z16N) is currently being sold by Amazon on Amazon's website at https://www.amazon.com/Loozys-Digital-Far-Infrared-Blanket-Controller/dp/B077Y2Z16N/.

Defendant Joseph Nilsen's Sentencing Memorandum-24
*United States v. Nilsen, et al.,* No. CR20-151 RAJ

Justine A. Harris
Krista Staropoli
Sher Tremonte LLP
90 Broad St., Floor 23
New York, NY 10004

1    through Mr. Nilsen and Ms. Leccese.  Indeed, Mr. Nilsen and Ms. Leccese likely made the least

2    money from this scheme and simply did not have the funds to pay for bribes themselves.  As

3    described above, the couple was paid only a modest and intermittent salary by Mr. K.

4         Beyond this core conduct, Mr. Nilsen worked with some of his co-conspirators, including

5    in particular Mr. Nuhanovic, to engage in several instances of online "attacks."  On two

6    occasions, Mr. Nilsen assisted clients who had been attacked by larger competitors, in one case

7    uploading a flat file replacing the product information with a "Guy Fawkes" image (Dkt. No. 1 at

8    4), and in another, filing a false IP complaint with Amazon that suspended that company's

9    account.  PSR ¶ 25.  These actions were taken in conjunction with Mr. Nuhanovic launching

10   false negative review attacks against these same companies.  While Mr. Nilsen is ashamed of his

11   vulgar online conduct, and in no way seeks to justify his actions, in both instances, the aggrieved

12   parties first approached Amazon to try to resolve the problem.  Only after getting no response

13   did they seek Mr. Nilsen's vigilante services.[6]

14        Finally, when Mr. Nilsen and Ms. Leccese were selling supplements, their account was

15   attacked by a competitor brand, a massive supplement seller and multi-millionaire named Kevin

16   Thobias – someone they had once considered a friend.  Mr. Nilsen initially sought relief from

17   Amazon.  When that failed, he retaliated with an online attack of his own, and the dispute

18   quickly spiraled out of control with the two parties engaging in a full out online "war."  The

19   dispute eventually ended in civil litigation and a settlement, in which both sides agreed to stand

20   down.  *See Better Mornings, LLC v. Nilsen et al.*, 2:19-cv-03854, Dkt. No. 28 (E.D.N.Y. 2020).

---

[6]    Mr. Nilsen also assisted another consultant – whose own 3P client had refused to pay his bills – by replacing the product listing with a vulgar emjoi (it is this image that the government features in its sentencing memorandum).

Defendant Joseph Nilsen's Sentencing Memorandum-25
*United States v. Nilsen, et al.,* No. CR20-151 RAJ

Justine A. Harris
Krista Staropoli
Sher Tremonte LLP
90 Broad St., Floor 23
New York, NY 10004

1   Importantly, during Mr. Nilsen's proffers, the Government made clear that as to the Thobias-

2   Nilsen dispute, "no one has clean hands."

3           Finally, while Mr. Nilsen transacted with each of the co-defendants, he did not play a

4   unique role in bringing the co-conspirators together.  First, Mr. Nilsen in no way had a monopoly

5   on insider contacts or "coordinated" the outreach to the insiders.  In fact, each of the co-

6   defendants worked to develop their own inside contacts.  Mr. Nuhanovic had approximately 3-4

7   Amazon insiders of his own in Hyderabad - "Cool," "V," "Hugo," and "Dipil."  Mr. Rosenberg,

8   deliberately chose to pay many of his bribes through Mr. Nilsen, but also worked directly with

9   Mr. Kunju, and had identified and recruited his own high-level Amazon employee in Seattle.

10   Other unindicted co-conspirators developed additional Amazon insiders in China and elsewhere.

11   Simply put, the conspiracy was a diffuse group of solo hustlers, and no particular individual can

12   fairly be deemed "central" to the illegal conduct.

13           Nor was Mr. Nilsen the connecting glue for his co-defendants.  Mr. Rosenberg has a huge

14   and powerful presence in the Amazon 3P world and ran – and still runs – a thriving and lucrative

15   consulting business with hundreds – if not thousands – of clients.  Together with Mr. Nilsen's

16   former boss, Cory Rosenbaum, Mr. Rosenberg had run a popular video webinar series on

17   Amazon selling.  At the outset of their relationship, Mr. Rosenberg *hired Mr. Nilsen* to help him

18   write POAs.  Moreover, it was Mr. Rosenberg who introduced Mr. Nilsen to Mr. Nuhanovic,

19   rather than the reverse.

20           Given Probation's determination that Mr. Nilsen's "conduct is most comparable to Mr.

21   Nuhanovic's," it is particularly important to emphasize the following points of distinction:

22         •   Using at least 10 seller accounts, Mr. Nuhanovic had a large-scale operation

Defendant Joseph Nilsen's Sentencing Memorandum-26
*United States v. Nilsen, et al.,* No. CR20-151 RAJ

Justine A. Harris
Krista Staropoli
Sher Tremonte LLP
90 Broad St., Floor 23
New York, NY 10004

1    dedicated to selling counterfeit products (DVDs) on Amazon.

2    • In conjunction with these seller accounts, Mr. Nuhanovic had a sophisticated business

3      structure, in which he operated close to 5,000 fraudulent buyer accounts with a vast

4      overseas network of contacts creating fake identifications (including fake passports)

5      corresponding to those accounts.

6    • Mr. Nuhanovic's operation was far more organized than Mr. Nilsen's and Ms.

7      Leccese's two-person shop in their rented one-bedroom apartment; Mr. Nuhanovic

8      paid one salaried employee, and utilized the services of Hadis's brother, Haris, and

9      another individual "Hifun," whom Mr. Nuhanovic paid $500/month to help identify

10     Chinese suppliers selling counterfeit DVDs.   Moreover, only Mr. Nuhanovic had the

11     funds needed to launch large scale negative review attacks – since a "buyer" needed

12     to purchase a product before entering a review.

13   • Mr. Nuhanovic directly stole from other sellers.  On one occasion, he illegally

14     accessed another seller's account, changed the bank routing information, and routed

15     $86,000 of funds to an account he controlled in Croatia.

16   Mr. Nilsen did not engage in any of this conduct, and, most importantly, unlike Mr. Nuhanovic,

17   he promptly cooperated with the Government, immediately admitting his involvement in the

18   offense.

19   Finally, in addition to the bribery, Mr. Nilsen pled guilty to tax fraud.  Specifically, for

20   tax years 2018 and 2019, Mr. Nilsen failed to file federal tax returns and pay taxes for himself or

21   for his company.  As to Digital Checkmate LLC, Mr. Nilsen reported income of $96,963, even

22   though it had gross receipts of at least $226,882.  He owes past tax due of $44,178 and will be

Defendant Joseph Nilsen's Sentencing Memorandum-27
*United States v. Nilsen, et al.,* No. CR20-151 RAJ

Justine A. Harris
Krista Staropoli
Sher Tremonte LLP
90 Broad St., Floor 23
New York, NY 10004

1   prepared to pay that amount at sentencing.

2
3                                    **III.**
4                    **THE APPLICABLE SENTENCING GUIDELINES**

5          There is no dispute with respect to Mr. Nilsen's sentencing guidelines.  His adjusted

6   offense level is 17, based on the following calculation:

7          Count Group 1: Conspiracy to Commit Violations of the Travel Act

8          • Base Offense Level (USSG §§2E1.2(a)(2) and 2B4.1(a)): 8

9          • Specific Offense Characteristics (here, estimated value of improper benefit

10            conferred was more than $150,000 but less than $250,000) (USSG §§2B4.1(b)

11            and 2B1.1(b)(1)(F)): + 10

12         • Adjusted Offense Level: 18

13         Count Group 3: Filing False Tax Return

14         • Base Offense Level (where tax loss is $44,178) (USSG §§2T1.1(a)(1) and

15            2T4.1(E)): 14

16         • Specific Offense Characteristics (here, failure to report income exceeding

17            $10,000) (USSG §2T1.1(b)(1)): +2

18         • Adjusted Offense Level: 16

19         Multiple Count Adjustment:

20         | Group/Count | Adjusted Offense Level | Units |
           |---|---|---|
21         | Count Group 1 | 18 | 1.0 |
22         | Count 3 | 16 | 1.0 |

23         • Total Number of Units: 2.0

*United States v. Nilsen, et al.,* No. CR20-151 RAJ

                                                    Justine A. Harris
                                                    Krista Staropoli
                                                    Sher Tremonte LLP
                                                    90 Broad St., Floor 23
                                                    New York, NY 10004

1    Greater of the Adjusted Offense Levels Above: 18

2    Increase in Offense Level: 2

3    Combined Adjusted Offense Level: 20

4              Acceptance of Responsibility pursuant to USSG §3E1.1(a): -2

5              Acceptance of Responsibility pursuant to USSG §3E1.1(b): -1

6    Total Offense Level: 17

7    With a criminal history category I, Mr. Nilsen's recommended guidelines range is 24-30 months.

8    PSR ¶ 103.[7]

9          Probation recommends a sentence of 20 months, without taking into account any

10   departure for Mr. Nilsen's extensive cooperation.  Probation Recommendation at 2.   Further, at

11   the conclusion of the PSR, Probation notes that the Court may want to consider Mr. Nilsen's

12   "extremely difficult upbringing, and his history drug addiction as mitigating factors" in

13   contemplating a sentence outside the Guidelines.  PSR ¶ 118.  Probation also recognized that the

14   Court could view Mr. Nilsen's criminal history as overstated because the "minor nature" of Mr.

15   Nilsen's 2014 misdemeanor conviction has a disproportional effect on the guidelines' calculation

16   in that it "precludes the application of a 2-level decrease pursuant to the proposed amendment to

17   USSG §4C1.1."  PSR ¶ 119.  Probation emphasized that with respect to the prior conviction, the

---

[7]        Until the evening before the final PSR was due, the parties believed that Mr. Nilsen was eligible for the forthcoming zero-point offender reduction and that his adjusted offense level was 15.  In fact, based on that belief, the Government intended to request a sentence of 14 months, representing a 20% downward departure from the low end of the guidelines range.  However, on August 24, 2023, Probation alerted defense counsel that the 2014 misdemeanor drug conviction – which had not been on anyone's radar in the months leading up to sentencing – should have been included in the criminal history section and added one point to Mr. Nilsen's criminal history.  PSR ¶ 24.  While one criminal history point does not change Mr. Nilsen's criminal history score, it does make him ineligible for the zero-point offender reduction.  It therefore increases his guidelines range from 18 to 24 months to 24 to 30 months. As a result, the Government increased its recommendation to 19 months.

Defendant Joseph Nilsen's Sentencing Memorandum-29                    Justine A. Harris
*United States v. Nilsen, et al.,* No. CR20-151 RAJ                          Krista Staropoli
                                                                     Sher Tremonte LLP
                                                                     90 Broad St., Floor 23
                                                                     New York, NY 10004

1   "circumstances of the offense are mitigating," and noted that if the Court "elects to apply the

2   variance for Adjustment Regarding Certain Zero-Point Offenders, Mr. Nilsen's offense level

3   would be 15 and his guidelines would be 18 to 24 months."  PSR Addendum.

## IV.
## MR. NILSEN'S RESPONSE TO THE GOVERNMENT'S
## MOTION PURSUANT TO USSG §5K1.1

7   On August 25, 2023, the Government filed its Motion Pursuant to USSG §5K1.1.  In it,

8   the Government affirms Mr. Nilsen's extensive cooperation, that he in fact provided "substantial

9   assistance" in this prosecution, and that this cooperation helped ensure the guilty pleas of two of

10  his co-defendants.  However, its submission fails to include important details pertinent to the

11  Court's evaluation of the extent of the departure warranted, and, pursuant to Loocal Rule CrR

12  32(i)(1)(A), we respectfully submit this response.

13  The law with respect to §5K1.1 is well established.  Once the Government makes a

14  motion "stating that the defendant has provided substantial assistance," the extent of the

15  appropriate reduction "shall be determined by the court" – not the Government  – and that the

16  grounds for such a reduction "may include, but are not limited to" the following factors: (1) the

17  Court's evaluation of the significance and usefulness of the defendant's assistance, taking into

18  consideration the Government's evaluation of the assistance rendered; (2) the truthfulness,

19  completeness, and reliability of any information or testimony provided by the defendant; (3) the

20  nature and extent of the defendant's assistance; (4) any injury suffered, or any danger or risk of

21  injury to the defendant or his family resulting from his assistance; and (5) the timeliness of the

22  defendant's assistance.  We respectfully submit that when the relevant factors are considered,

23  Mr. Nilsen's cooperation merits significantly more than a 20% departure.

Defendant Joseph Nilsen's Sentencing Memorandum-30
*United States v. Nilsen, et al.,* No. CR20-151 RAJ

Justine A. Harris
Krista Staropoli
Sher Tremonte LLP
90 Broad St., Floor 23
New York, NY 10004

1        First, while all of the defendants eventually pled guilty in this case, Mr. Nilsen's

2    acceptance of responsibility was almost immediate.  The day after the FBI executed a search

3    warrant at Mr. Nilsen's apartment, but before charges had been filed, Mr. Nilsen had his attorney

4    contact one of the agents to confirm that Mr. Nilsen wanted to cooperate with law enforcement.

5    Within a week – again, before the indictment – Mr. Nilsen made an initial proffer.  After

6    indictment, new counsel continued those efforts and, on October 23, 2020, November 12, 2020,

7    and December 2, 2020, made several multi-hour attorney proffers laying out the extent of his

8    involvement and all the information that Mr. Nilsen knew or had in his possession.  Perhaps

9    because the AUSAs who handled the case have since left the office, the Government's §5K1.1

10   motion omitted these early and important steps towards cooperation, and noted only Mr. Nilsen's

11   2021 proffers beginning on March 23, 2021.  Those early proffers made clear that Mr. Nilsen

12   promptly accepted full responsibility and provided information about a host of other bad actors

13   in the Amazon Marketplace.  Accordingly, the Court should credit favorably the timeliness of

14   Mr. Nilsen's assistance.

15       Second, as to the "nature and extent" of Mr. Nilsen's cooperation, it is important to

16   provide the Court with additional information relating to the data contained on the cloud-based

17   server referenced in the Government's submission.  USSG §5K1.1(a)(3).  Shortly after

18   indictment, in November 2020, Mr. Nilsen and Ms. Leccese signed consent forms and turned

19   over passwords to an offshore server (the "MEGA server"), which the Government otherwise

20   would not have been able to access.  At the Government's request, Mr. Nilsen and Ms. Leccese

21   themselves reviewed many of the communications stored on MEGA and organized them into

22   folders relating to either co-defendants, or other individuals of interest.  This near-herculean

Defendant Joseph Nilsen's Sentencing Memorandum-31
*United States v. Nilsen, et al.,* No. CR20-151 RAJ

Justine A. Harris
Krista Staropoli
Sher Tremonte LLP
90 Broad St., Floor 23
New York, NY 10004

1    effort, given the amount of data involved, is memorialized in six emails sent to AUSAs with

2    accompanying indices and links to files containing the relevant communications.  *See e.g.*, Ex. G,

3    March 22, 2021 Email.

4           Indeed, while the Government submission claims that "most of the files disappeared from

5    the Cloud storage service before the Government was able to retrieve them," (Gov't §5K1.1. at

6    4), in fact, the MEGA records indicate that law enforcement accessed the server more than once,

7    and for substantial periods of time, before the deletion.  Specifically, users with the FBI Seattle

8    IP address "logged in" to one of the MEGA accounts and accessed the data on November 13,

9    2020, December 7, 2020, and December 10, 2020, staying logged in for a cumulative period of

10   28 days.  During these sessions, the user appeared to employ advanced digital techniques,

11   allowing the user to move, copy, or list massive amounts of files quickly.  Beyond that, in

12   February 2021, AUSA Steve Masada specifically told defense counsel in a phone call that

13   "Mega was very helpful to [the] agents" and that there was "a lot of data" there.  In short, while

14   eventually the data may have been deleted by the service provider, it appears that the information

15   was available to the agents well into 2021 and, contrary to the Government's assertions, was

16   "helpful" to the investigation.[8]

17          Third, it is important to emphasize that Mr. Nilsen was completely forthcoming during all

18   of the proffers.  There was not a single instance in which Mr. Nilsen needed to be confronted

19   with a document to correct an answer or "refresh" his recollection.  Throughout this matter,

---

[8]      The statements of AUSA Masada were memorialized in contemporaneous notes during the call.  As the
Government claims, at some point MEGA deleted the data, although Mr. Nilsen and Ms. Leccese discovered that
fact only recently when they tried to log into the account to access personal information.  Had the Government
informed us of the deletion sooner, Ms. Leccese could have provided a backup of one of the accounts and made it
available for the agents' continued review.

Defendant Joseph Nilsen's Sentencing Memorandum-32                                    Justine A. Harris
*United States v. Nilsen, et al.,* No. CR20-151 RAJ                                   Krista Staropoli
                                                                                      Sher Tremonte LLP
                                                                                      90 Broad St., Floor 23
                                                                                      New York, NY 10004

1    defense counsel was in frequent contact with the Government (through the prior AUSAs) to

2    ensure that everything was going smoothly, and not once did they express any concern that Mr.

3    Nilsen was holding back or had not accurately described all the relevant information.

4         In short, every factor listed in USSG **§**5K1.1 militates in favor of a more generous

5    departure, and we request that the Court depart downward by 50%.

6                                          **V.**
7                **THE 3553(A) FACTORS WARRANT A NON-CUSTODIAL SENTENCE**

8         The overarching command of Section 3553(a) is that sentences should be "sufficient, but

9    not greater than necessary" to serve the purposes of sentencing.  18 U.S.C. §3553(a) (2012).  *See*

10   *also United States v. Carty*, 520 F.3d 984, 991 (9th Cir. 2008).  A district court "may not

11   presume that the Guidelines range is reasonable," but instead "make an individualized

12   assessment based on the facts presented."  *Gall*, 552 U.S. at 50.  Thus, in addition to the

13   Guidelines, courts are also required to consider a variety of other factors set forth in §3553(a),

14   including the "nature and circumstances of the offense" and the "history and characteristics of

15   the defendant."  18 U.S.C. §3553(a)(1).  Indeed, the Supreme Court has "emphasized that

16   '[h]ighly relevant—if not essential—to [the] selection of an appropriate sentence is the

17   possession of the fullest information possible concerning the defendant's life and

18   characteristics.'"  *Pepper v. United States*, 562 U.S. 476, 487-88 (2011) (citations omitted)

19   (alterations in original).  In determining a sentence, "a sentencing judge must have a generosity

20   of spirit, that compassion which causes one to know what it is like to be in trouble and in pain."

21   *United States v. Singh*, 877 F.3d 107, 121 (2d Cir. 2017) (internal quotation marks and citation

22   omitted).

Defendant Joseph Nilsen's Sentencing Memorandum-33
*United States v. Nilsen, et al.,* No. CR20-151 RAJ

Justine A. Harris
Krista Staropoli
Sher Tremonte LLP
90 Broad St., Floor 23
New York, NY 10004

A.    Mr. Nilsen's Trauma History and Resulting Psychological Conditions Mitigate His Culpability and Warrant Leniency

Mr. Nilsen's culpability is substantially mitigated by his extraordinary trauma history and his corresponding mental health conditions.  Courts have long recognized that childhood trauma that leaves mental and emotional scars is a sound reason to exercise leniency, even in the pre-*Booker* era.  *See, e.g.*, *United States v. Walter*, 256 F.3d 891, 894 (9th Cir. 2001) (extraordinary childhood abuse warranted a departure); *see also United States v. McBride*, 511 F.3d 1293, 1297 (11th Cir. 2007) (affirming sentencing court's determination that history of abuse and abandonment supported downward variance from 151 to 188 months' imprisonment to 84 months).

Here, the abuse Mr. Nilsen endured as a child was horrific.  From as young as five years old until Mr. Nilsen's father was forcibly removed from his home, Mr. Nilsen endured constant and terrifying eruptions of rage that resulted in abuse so severe it required medical attention on multiple occasions.  Mr. Nilsen's subsequent drug abuse as a young adult snowballed into a series of additional traumas – the devastating death of his closest friend and a period of homelessness.

Given these experiences, it is unsurprising that Mr. Nilsen scored a 7/10 on the Adverse Childhood Experiences test administered by the Probation Department.  *See* PSR ¶¶ 89-91.  As The Center for Disease Control has recognized that as the number of ACEs increases, "so does the risk for negative behavioral and health outcomes[.]"  *See also* Debra E. Houry et al., *Adverse Childhood Experiences (ACEs) Prevention, Resource for Action*, at 8 (2019), https://www.cdc.gov/violenceprevention/pdf/ACEs-Prevention-Resource_508.pdf (ACEs can cause toxic stress during childhood, which "can harm the most basic levels of the nervous,

Defendant Joseph Nilsen's Sentencing Memorandum-34
*United States v. Nilsen, et al.,* No. CR20-151 RAJ

Justine A. Harris
Krista Staropoli
Sher Tremonte LLP
90 Broad St., Floor 23
New York, NY 10004

1   endocrine, and immune systems," and are correlated with "obesity," "depression," and "drug

2   use").

3        Indeed, as documented in full by Dr. Landow in her report, these experiences scarred Mr.

4   Nilsen for life.  She diagnosed him with PTSD, opioid use disorder (in sustained remission), and

5   generalized anxiety disorder.  *See* Ex. A at 12-13.  Each of these conditions has shaped Mr.

6   Nilsen's personality and behavior.  For years, Mr. Nilsen experienced recurrent memories,

7   nightmares, and flashbacks to traumatic moments in his childhood.  He is easily prone to

8   excessive and uncontrollable worry, causing him personal distress and to withdraw from the

9   world.  In fact, his anxiety is plain in how he communicates; Dr. Landow has characterized Mr.

10  Nilsen as having a "weak vocal style" – he stutters and often struggles with fluency.  *Id.* at 12.

11  Internally, he has experienced profoundly negative feelings about himself, and has difficulty

12  sleeping and concentrating.  His anxiety triggers episodes of severe personal distress and results

13  in difficulty interacting with others, while his PTSD includes symptoms of "exaggerating blame

14  of self or others for causing the traumas, negative affect, feeling isolated, [and] decreased interest

15  in activities."  *Id.* at 12.  In short, from childhood, Mr. Nilsen has carried with him enormous

16  unprocessed pain.

17       Mr. Nilsen's trauma history is especially mitigating here because it helps explain his

18  offense conduct in two related, but distinct ways.  *See United States v. Brady*, 417 F.3d 326, 333

19  (2d Cir. 2005) (noting, in mandatory Guidelines case, that "a downward departure may be

20  warranted on the ground that extreme childhood abuse caused mental and emotional conditions

21  that contributed to the defendant's commission of the offense").  First, it is inextricably

22  intertwined with how Mr. Nilsen first became involved in this conduct.  Mr. Nilsen's childhood

Justine A. Harris
Krista Staropoli
Sher Tremonte LLP
90 Broad St., Floor 23
New York, NY 10004

1   was dangerous – physically and psychologically.  As a result, Mr. Nilsen developed a "survival

2   mentality" – he "trusted no one" and "never ask[e]d for help."  Mr. Nilsen had this mentality for

3   almost the entirety of the offense conduct.  Indeed, during this period, Mr. Nilsen "spent many

4   years in a work dynamic with Mr. K. that paralleled his toxic relationship with his father, one of

5   use and abuse that led Joe down a hole he didn't feel he could ever get out of."  *See* Ex. A at 13.

6   And it was while he struggled with this work dynamic that Mr. Nilsen became involved in the

7   criminal activity; in fact, Mr. K. opened the company Digital Checkmate under Mr. Nilsen's

8   name for the sole purpose of using it as a vehicle to transmit bribe payments on behalf of Mr.

9   K.'s company.  PSR ¶ 82.

10          Mr. Nilsen's mental health diagnosis also helps explain – although not excuse – his

11   "malicious attack" conduct, which both the Government and the Probation Department point to

12   as aggravating.  Indeed, the record is replete with vindictive text and email messages from Mr.

13   Nilsen, in which he attempts to demand respect through loaded and, sometimes, threatening

14   language.  Again, Mr. Nilsen has deep remorse for his vulgar and aggressive online conduct.  But

15   not only was this conduct relatively isolated, and in truth more fairly labeled "counterattacks,"

16   the behavior was clearly linked to his mental health conditions.  Mr. Nilsen admitted to Dr.

17   Landow that helping a small 3P seller (the perceived victim) defend itself against a larger 3P

18   seller made him feel powerful in a way that he was not in other parts of his life, especially in his

19   childhood.  *See* Ex. A at 7-8.  Dr. Landow concluded that when his or other seller accounts were

20   attacked by other sellers, this triggered "retaliatory defense mechanisms [Mr. Nilsen] had learned

21   in childhood," and "he responded with his own online sabotage, the only tool he had to

22   compensate for his perceived impotence in the world."  *Id.* at 13.  The power, of course, was an

Defendant Joseph Nilsen's Sentencing Memorandum-36
*United States v. Nilsen, et al.,* No. CR20-151 RAJ

Justine A. Harris
Krista Staropoli
Sher Tremonte LLP
90 Broad St., Floor 23
New York, NY 10004

1    illusion, as in real life, Mr. Nilsen and Ms. Leccese were under Mr. K's thumb, and barely

2    scraping by.  That Mr. Nilsen's most egregious conduct was "deeply influenced by his past

3    traumas," *id.*, does not in any way excuse his behavior, but it does contextualize it in such a way

4    that both warrants leniency and distinguishes his bad conduct from that engaged in by others

5    who acted purely out of greed. [9]

6    B.    Mr. Nilsen has Rehabilitated, Demonstrating that There is No Risk of Recidivism
7          and That a Prison Sentence is Not Needed to Protect the Public or Achieve
8          Specific Deterrence.

9         A variance is also warranted because Mr. Nilsen has taken substantial steps to make

10   amends for his wrongful conduct and has a demonstrated track record of rehabilitation.

11   "Extraordinary rehabilitation," which Courts have cited as grounds for leniency, "is not narrowly

12   defined or limited to cases of defendants overcoming their drug addiction," *United States v.*

13   *Bryson*, 163 F.3d 742, 747 (2d Cir. 1998).  To evaluate Mr. Nilsen's rehabilitation, it is

14   particularly important to consider his "baseline" – for the "achievement of the ordinary

15   responsibilities of citizenship, such as regular employment and support of dependents [],

16   depending on the starting point of rehabilitation, [could] be sufficient … if that achievement is

17   the product of substantial commitment sustained over time." *Id.* at 748-49.  Here, Mr. Nilsen has

18   made remarkable efforts to address a variety of destructive behaviors that have negatively

19   impacted his life, and his quantifiable progress makes clear that a lengthy sentence is not needed

---

[9]       While in no way justifying his behavior, Mr. Nilsen refused to engage in *unprovoked* sabotage of a 3P
seller account.  For example, in November 2019, Mr. Nilsen's client, Howard Thai, asked Mr. Nilsen to attack New
Age Wholesale, a small third-party seller of hemp oil.  Mr. Nilsen understood the reason for the attack to be purely
economic – to shut down Mr. Thai's leading competitor so that Mr. Thai could assume more of the market – and Mr.
Nilsen refused and cut ties with Mr. Thai.  In fact, Mr. Nilsen went as far as to warn the owner of New Age
Wholesale about the impending attack so that the owner could alert Amazon and secure preemptive protection,
which Mr. Nilsen believes the owner did.

Defendant Joseph Nilsen's Sentencing Memorandum-37                          Justine A. Harris
*United States v. Nilsen, et al.,* No. CR20-151 RAJ                          Krista Staropoli
                                                                             Sher Tremonte LLP
                                                                             90 Broad St., Floor 23
                                                                             New York, NY 10004

1    to achieve individual deterrence or protect the public.

2           First, regardless of the extent to which a defendant's cooperation is deemed "useful" by

3    the Government, the mere fact that a defendant promptly came clean is perhaps the most

4    profound indicator of his desire to make amends and live a law-abiding life. *See Acosta v.*

5    *United States*, No. CR 04-645-JFW, 2010 WL 11681518, at *3 (C.D. Cal. May 21, 2010) (noting

6    that the district court considered the defendant's attempt to cooperate, even though the

7    information furnished did not compel the Government to file a substantial assistance motion);

8    *See United States v. Fernandez*, 443 F.3d 19, 33 (2d Cir. 2006) ("[I]n formulating a reasonable

9    sentence a sentencing judge must consider 'the history and characteristics of the defendant' . . .

10   and should take under advisement any related arguments, including the contention that a

11   defendant made efforts to cooperate, even if those efforts did not yield a Government motion for

12   a downward departure pursuant to U.S.S.G. §5K1.1.").  In this case, of course, the Government

13   did file a §5K1.1 motion, but the fact that Mr. Nilsen came forward within thirty-six hours of the

14   FBI executing a search warrant on his home (a fact omitted in the Government's §5K1.1 motion)

15   illustrates his fundamental character and that he understands the scope of the harm he had

Defendant Joseph Nilsen's Sentencing Memorandum-38
*United States v. Nilsen, et al.,* No. CR20-151 RAJ

Justine A. Harris
Krista Staropoli
Sher Tremonte LLP
90 Broad St., Floor 23
New York, NY 10004

1    inflicted.[10]

2          Second, it is also significant that Mr. Nilsen has made profound changes in his work

3    environment, previously a source of distress and dysfunction that contributed to his poor decision

4    making.  Mr. Nilsen channeled his effort into honing his computer science skills, taking classes

5    on how to effectively utilize machine learning and AI.  Mr. Nilsen then created a business that

6    uses advanced technology to identify and sift out online misconduct.

7          Given his own terrible work experiences in the past, one of Mr. Nilsen's top priorities

8    when establishing TraceFuse was to create a healthy workplace where employees feel valued and

9    respected.  As recognized in Akram Taha's letter, Mr. Nilsen treats his employees with kindness,

10   and expresses gratitude daily.  *See* Ex. D, Ltr. of A. Taha, at 7 ("Every day, Joe sends a message

11   saying, 'Thank you for your great work today' at the end of the day to all of our team members.

12   Small actions like this are so meaningful, and it is difficult for me to imagine what things would

13   look like without Joe around to hold and guide our team.").  He responds to tense situations with

14   patience and understanding, and where appropriate, a little humor to lighten the mood.  This is in

15   stark contrast to man Mr. Nilsen was when he was in the trenches of various Amazon disputes.

---

[10]    Mr. Nilsen's approach is in stark contrast with that of some of his co-defendants. Ed Rosenberg, in particular, made public statements that denigrated both the Government's investigation and prosecutors.  *See* May 18, 2022 Ed Rosenberg Facebook Post ("You saw right through the HOAX from the beginning . . . . The truth includes a lot of fake screenshots, extreme blackmail against me and amazon.com, a pathetic misunderstanding of what asgtg is, a professional frame job, a desperate urge to hit a 6 run home run, and a few [white hat] consultants that were real upset . . . ."); December 30, 2022 Ed Rosenberg post ("I was hoping to speak to ASGTG9 about the 'indictment' of Sept 2020 I was accused of when in fact I was the triple VICTIM").  As the Government recognized, Mr. Rosenberg "repeatedly attacked the indictment and proclaimed his innocence using social media Rosenberg referred to the indictment as a hoax and phony crockdictment, and he accused law enforcement of failing to do basic fact-checking." Dkt. No. 193 at 11.  Indeed, it was only after Mr. Nilsen's cooperation materials were produced to other defendants that Ed Rosenberg apologized for years of denial and pleaded guilty.  Despite receiving a generous sentence – supported by the Government – it appears that Mr. Rosenberg has continued to deny his culpability and post sarcastic comments about Amazon and the investigation online.  *See* Reddit Reply Posts by "Asgtg" (Aug. 28, 2023), https://www.reddit.com/user/ASgtg/?rdt=39926 ("They didn't get one thing right in 5 years on me.") ("This will be the most bungled impossible to believe FBI investigation ever.") ("They 'caught' exactly the wrong guy.") ("BTW zero people have corroborated one word of the indictment against me and zero accounts suspended[.]").

Defendant Joseph Nilsen's Sentencing Memorandum-39
*United States v. Nilsen, et al.,* No. CR20-151 RAJ

Justine A. Harris
Krista Staropoli
Sher Tremonte LLP
90 Broad St., Floor 23
New York, NY 10004

*See* Ex. A, Landow Report, at 6. ("[Mr. Nilsen] was having panic attacks regularly, and he had a short fuse when speaking to friends or family.").  Mr. Nilsen also takes pride in the substance of his work – building technology that identifies fraudulent and harmful one-star reviews designed to unfairly destroy the reputation of a third-party seller's business.  His business partner, Shane Barker, recognizes how essential Mr. Nilsen is to their joint venture, noting that Mr. Nilsen's "knowledge, skill and innovation is what keeps our business running – frankly, without Joe, this business would not have the ability to run at all."  Ex. D, Ltr. of S. Barker at 2.

Finally, and most importantly, Mr. Nilsen has made substantial strides in bettering himself, both physically and mentally.  *See* Ex. C at 8.  ("He has actively engaged in self-reflection and sought guidance from my family including myself to help him address the root causes of his past mistakes that led him into trouble.").  By virtue of Mr. Nilsen's business, he now has a steady income and a sustainable lifestyle that has allowed him to prioritize seeking the mental and physical help that he needs.  Since approximately November 2020, Mr. Nilsen has participated in bi-weekly therapy sessions with Dr. Landow, reflecting on the motivation behind his actions, and exploring ways to develop better coping mechanisms and communication skills.[11]  Mr. Nilsen has been "motivated and engaged in psychotherapy and has exhibited a positive response."  *See* Ex. A at 13.  Indeed, Dr. Landow concludes that there are a "number of strong resources in his life that are positive indicators for [a] good [] prognostic outcome."  *Id.* While Mr. Nilsen's deep-seated psychological issues are by no means cured, Dr. Landow reports that "[g]iven [Mr. Nilsen's] age and the extent to which he now understands his past behavior,

---

[11]      This date range excludes the period of time in which Mr. Nilsen could not afford basic necessities, let alone mental health treatment.

Defendant Joseph Nilsen's Sentencing Memorandum-40
*United States v. Nilsen, et al.,* No. CR20-151 RAJ

Justine A. Harris
Krista Staropoli
Sher Tremonte LLP
90 Broad St., Floor 23
New York, NY 10004

1    combined with his motivation to engage in treatment, his prognosis for improving his level of

2    psychological functioning and maintaining a positive course is excellent."  Ex. A, Landow

3    Report, at 13.  Further, after years of unexplained obesity and painful, debilitating swelling in his

4    legs, Mr. Nilsen has finally been able to secure health insurance and seek the medical care he

5    needs to meaningfully address his chronic symptoms.  *See* Ex. E, Lymphedema Clinic Note, at

6    95 (directing Mr. Nilsen to participate in a local lymphedema clinic).

7        While Probation expresses "hop[e] that Mr. Nilsen will use any custodial time to

8    reevaluate his circumstances and plan for a productive future," (*id.*), the irony is that Mr. Nilsen

9    has used the last three years to do exactly that.  In 2021, Mr. Nilsen and Ms. Leccese were broke

10   and despairing about the future.  Somehow, "both of them dug deep and started to figure out

11   ways to carry on and build a new life."  Having achieved stability and all the attributes of

12   "ordinary citizenship," *Bryson*, 163 F.3d at 747, a lengthy sentence of incarceration will likely do

13   more harm to the public interest than good; it would interrupt his medical care and mental health

14   treatment, and risk jeopardizing the financial and employment stability that he and Mr. Leccese

15   have worked so hard to achieve.

16        C.    A Sentence of Incarceration Would Impose Undue Hardship, as Mr. Nilsen Needs
17               Substantial Medical and Mental Health Treatment

18        Equally concerning, and a further ground for a variance, is that Mr. Nilsen is suffering

19   from myriad serious health conditions and is unlikely to receive adequate medical care or mental

20   health treatment while incarcerated.  *See United States v. Boy*, 19 F.3d 30 (9th Cir. 1994)

21   (holding that a downward departure was warranted where the defendant had a degenerative hip

22   and knee condition, which would likely get worse over time, and was afflicted with non-active

23   tuberculosis and hyperactive adjustment disorder."); *United States v. Rioux*, 97 F.3d 648 (2d Cir.

Defendant Joseph Nilsen's Sentencing Memorandum-41
*United States v. Nilsen, et al.,* No. CR20-151 RAJ

Justine A. Harris
Krista Staropoli
Sher Tremonte LLP
90 Broad St., Floor 23
New York, NY 10004

1    1996) (finding no abuse of discretion where district court applied a downward departure where a

2    defendant's health – while stable – required regular monitoring and medication, and had

3    potential to get worse.  *See also* USSG §5H1.4 ("An extraordinary physical impairment may be

4    a reason to depart downward; *e.g.,* in the case of a seriously infirm defendant, home detention

5    may be as efficient as, and less costly than, imprisonment.").

6        Here, as detailed *supra*, Mr. Nilsen suffers from lymphedema – a chronic condition that

7    occurs when the lymphatic system is not working – as well as a host of serious ailments that

8    require constant monitoring and care.[12]  To control the symptoms of lymphoedema, Mr. Nilsen

9    must wear compression garments (which Joe cannot put on himself), maintain the integrity of his

10   compromised skin through rigorous skincare protocols, exercise regularly, have a healthy diet,

11   and undergo specialized therapy at least five days per week.  Given the limited food available at

12   the jail, and the strict schedules inmates must follow, it will be near impossible for Mr. Nilsen to

13   maintain the healthy routine needed to prevent further debilitation in his conditions.  Certainly,

14   the manual lymphatic drainage therapy, only recently prescribed for Mr. Nilsen, will not be

15   available in the BOP and while most of his medication (including the weight loss injections) are

16   approved, it is unlikely that the BOP will continue his Adderall prescription – which will

17   undoubtedly only increase his anxiety.  Given the overlapping and complex health problems Mr.

18   Nilsen has, there is a real concern that the BOP simply won't be able to care for him, warranting

19   a substantial downward variance.

20       Setting aside the fact that Mr. Nilsen will not receive adequate treatment in a BOP

---

[12]    In addition to suffering from morbid obesity and lymphedema, Mr. Nilsen has been diagnosed with peripheral edema, insulin resistance, gastroesophageal reflux disease, obstructive sleep apnea, prediabetes, and arrythmia.

Justine A. Harris
Krista Staropoli
Sher Tremonte LLP
90 Broad St., Floor 23
New York, NY 10004

facility, it is also all but certain that he will struggle enormously with the physical realities of

carceral life.  Because of the swelling in his legs, he cannot walk more than a few blocks before

needing to rest and struggles to do basic things like put on his own shoes.  PSR ¶ 85. Moreover,

his feet are a size 12, and he will have a hard time fitting into the required standard-issue steel

toe work boots.  Walking, while very much needed to maintain blood flow to his legs and to

curtail further weight gain, will be that much more painful for him.  At home, Mr. Nilsen is able

to put his legs up when the swelling becomes too painful; in jail, he will not have control over his

own schedule and will likely be forced to remain on his feet well beyond the time that it is no

longer sustainable.  Indeed, most prisons are not designed to meet the "structural or

programmatic" needs of individuals with mobility issues, "buildings may be scattered throughout

the prison complex, requiring inmates to walk a distance to access healthcare, meals, and

additional services and activities", or be architecturally designed in a manner that requires

inmates to climb multiple flights of stairs.  *See* Jamie Fellner*, Old Behind Bars,* Human Rights

Watch (March 28, 2023). https://www.hrw.org/report/2012/01/28/old-behind-bars/aging-prison-

population-united-states#_ftn94.

        In short, to the extent a prison sentence is designed to impose suffering on the wrongdoer,

it is important to emphasize that the extent of Mr. Nilsen's suffering will be magnified by his

serious physical problems, warranting a variance.  *See United States v. Shadduck*, 889 F. Supp. 8,

11 (D. Mass. 1995) (applying a downward departure in part because the defendant was "a

diabetic who suffers as well from hypothyroidism, diabetic retinopathy, and recently,

hypertension").  Even assuming Mr. Nilsen is designated to a facility with adequate medical

services, the Court should consider that the conditions of confinement will be much more severe

Defendant Joseph Nilsen's Sentencing Memorandum-43
*United States v. Nilsen, et al.,* No. CR20-151 RAJ

Justine A. Harris
Krista Staropoli
Sher Tremonte LLP
90 Broad St., Floor 23
New York, NY 10004

1   for Mr. Nilsen than for an inmate without the same health challenges.  *See United States v.*

2   *Lopez-Salas*, 266 F.3d 842, 850 (8th Cir. 2001) (recognizing that a departure may be appropriate

3   where there is an "undeserved increase in the severity of conditions of confinement, which

4   would affect a substantial portion of a defendant's sentence"); *see also United States v. Carty*,

5   264 F.3d 191, 193 (2d Cir. 2001) (remanding for consideration of defendant's request for

6   downward departure for presentence conditions of confinement).

7           Finally, there is also little doubt that Mr. Nilsen's mental health would suffer while

8   incarcerated, putting him at increased risk of relapse and regression with respect to his

9   psychological progress.  *See* Ex. A at 13 ("Joe remains quite fragile psychologically; these

10  improvements have been marked with periods of regression, particularly as Joe has attempted to

11  navigate the overwhelming legal/justice system while fearing for his future.").  Locking Mr.

12  Nilsen into a highly regulated and anxiety-ridden prison environment risks triggering the same

13  "retaliatory defense mechanisms" Mr. Nilsen learned in childhood and that animated much of his

14  criminal conduct. *Id.*   Indeed, hyperarousal and anxiety, traits directly associated with PTSD, are

15  only exacerbated in custodial settings.  *See* Craig Haney, *The Psychological Impact of*

16  *Incarceration, Implications for Post-Prison Adjustment*, National Policy Conference, HHS

17  (January 2002).  In short, custody will do nothing to prepare Mr. Nilsen for his release into the

18  community; to the contrary, the punitive conditions of her confinement risks hardening Mr.

19  Nilsen's unhealthy survival tactics and entrenching his maladaptive psychological defenses, only

20  making his ultimate re-entry that much more difficult.

21          It is not an exaggeration to say that every day in jail will be a nightmare for Mr. Nilsen.

22  It could be catastrophic to his physical health, and risks undoing all of the therapeutic progress

Defendant Joseph Nilsen's Sentencing Memorandum-44                                    Justine A. Harris
*United States v. Nilsen, et al.,* No. CR20-151 RAJ                                           Krista Staropoli
                                                                                                                     Sher Tremonte LLP
                                                                                                                     90 Broad St., Floor 23
                                                                                                                     New York, NY 10004

1  he has made with Dr. Landow.  Those who have witnessed Mr. Nilsen's long and arduous health

2  battles express tremendous concern about his ability to survive a jail sentence.  *See* Ex. C, Ltr. of

3  J. Nilsen at 14 ("I worry that being constricted in an institution with so many people will expose

4  him to diseases that his compromised immune system cannot fight.  This would be a death

5  sentence to him.").  In these circumstances, a downward variance is warranted.[13]

6      D.    A Variance is Also Warranted Because Mr. Nilsen's 2014 Misdemeanor
7            Conviction has a Disproportionate Effect on Mr. Nilsen's Guidelines Range

8          The Sentencing Commission has proposed amending the Guidelines to provide for a two-

9  point reduction in the offense level for certain defendants with zero criminal history points.  *See*

10  USSG §4C1.1 (Adjustment for Certain Zero-Point Offenders).  Absent action by Congress to

11  veto the proposal, the amendment will go into effect as of November 1, 2023.  In explaining the

12  reasons for the amendment, the Commission noted:

13              Recidivism data analyzed by the Commission suggest that
14              offenders with zero criminal history points ("zero-point"
15              offenders) have considerably lower recidivism rates than other
16              offenders, including lower recidivism rates than the offenders in
17              Criminal History Category I with one criminal history point. See
18              U.S. SENT'G COMM'N, RECIDIVISM OF FEDERAL
19              OFFENDERS RELEASED IN 2010 (2021), available at
20              https://www.ussc.gov/research/research-reports/recidivism-federal-
21              offenders-released-2010. Among other findings, the report
22              concluded that "zero-point" offenders were less likely to be
23              rearrested than "one point" offenders (26.8% compared to 42.3%),
24              the largest variation of any comparison of offenders within the
25              same Criminal History Category. In addition, 28 U.S.C. § 994(j)
26              directs that alternatives to incarceration are generally appropriate
27              for first offenders not convicted of a violent or otherwise serious

---

[13]    Further, the risks of additional COVID outbreaks in the prison setting remain a potent risk for someone like him who is morbidly obese, has a history of lung conditions, and suffers from hypertension. Dr. William F. Marshall III, *COVID-19 And High Blood Pressure*, Mayo Clinic (June 30, 2020), https://www.mayoclinic.org/diseases-conditions/coronavirus/expert-answers/coronavirus-high-blood-pressure/faq-20487663.

Defendant Joseph Nilsen's Sentencing Memorandum-45
*United States v. Nilsen, et al.,* No. CR20-151 RAJ

Justine A. Harris
Krista Staropoli
Sher Tremonte LLP
90 Broad St., Floor 23
New York, NY 10004

1    offense.

2

3    Sentencing Guidelines for United States Courts, 88 Fed. Reg. 28254 (May 3,

4    2023) (effective Nov. 1, 2023).

5    Here, all the parties originally anticipated that Mr. Nilsen would be eligible for the two-

6    point reduction.  Indeed, the draft Presentence Report had indicated that Mr. Nilsen had zero

7    criminal history points and noted that this Court could impose a variance in advance of the new

8    reduction taking effect.  The Government had even executed with Mr. Nilsen "An Agreement

9    and Waiver for Early Application of Proposed Sentencing Guideline Amendment 4C1.1."  But

10   on the eve of the final report being due, the Probation Department determined that Mr. Nilsen's

11   2014 misdemeanor conviction for drug paraphernalia could not be excluded and that Mr. Nilsen

12   had one criminal history point. PSR Addendum, Additional outstanding issue.  While one

13   criminal history point makes no difference to Mr. Nilsen's criminal history score, because the

14   new reduction is limited to those defendants with "zero" criminal history points, Mr. Nilsen is

15   technically no longer eligible for the reduction.

16   However, as pointed out by the Probation Department in its final report, this Court "could

17   view Mr. Nilsen's criminal history is overstated" given that the "minor nature of [his] only

18   conviction precludes the application of the 2-level decrease pursuant to the proposed amendment

19   to USSG 4C1.1[.]"  Indeed, that is precisely what the Court should do.  As detailed *supra*, the

20   circumstances of this offense do not in any way suggest that Mr. Nilsen is more likely to

21   recidivate than individuals with "0" criminal history points.  First, the underlying conduct barely

22   constituted a crime.  There were no actual drugs in the car, only residue, and Mr. Nilsen was not

23   in fact using drugs.  Rather, he was on his way to a sober house to continue appropriate drug

Defendant Joseph Nilsen's Sentencing Memorandum-46
*United States v. Nilsen, et al.*, No. CR20-151 RAJ

Justine A. Harris
Krista Staropoli
Sher Tremonte LLP
90 Broad St., Floor 23
New York, NY 10004

1    treatment, and subsequently pled guilty by phone while he was in a long-term rehab facility.

2    Given that the 2014 misdemeanor is inextricably intertwined with his addiction, a condition that

3    has long been recognized to be disease, rather than an indication of a fundamental character flaw

4    or proclivity for crime, it would be profoundly unfair to sentence him as a greater recidivism

5    risk.

6           Second, Mr. Nilsen was sentenced to one year of probation for this conviction, which he

7    completed without incident.  PSR ¶ 65. Yet now, seven years later, this conviction could increase

8    his sentence potentially by *six months*, as the bottom of the guidelines have increased from 18 to

9    24 months.  Indeed, inexplicably, based on the discovery of this 2014 drug misdemeanor, the

10   Government changed its recommendation from 14 months to 19 months.  Especially given the

11   mitigating circumstances, as well as Mr. Nilsen's cooperation with the government, it makes

12   little sense for such a minor drug infraction to have *any* effect, let alone such a disproportionate

13   effect, on Mr. Nilsen's federal fraud sentence.

14          Fortunately, post-*Booker*, this Court is not bound by the Guidelines, and we respectfully

15   urge the Court to vary downward to compensate for the unreasonable impact of Mr. Nilsen's

16   2014 misdemeanor conviction on his offense level.  Indeed, had the zero-point offender

17   reduction applied, Mr. Nilsen's guidelines would have been 18-24 months.  Even applying the

18   Government's very modest 20% substantial assistance credit, Mr. Nilsen's recommended

19   sentence would reduce to 14 months – *before* consideration of the substantial mitigation.

20          E.    <u>A Prison Sentence is Not Needed to Meet the Goals of General Deterrence,</u>
21                <u>Promote Respect for the Law or Avoid Unwarranted Disparities</u>

22          A sentence of home confinement would be sufficient to achieve general deterrence,

23   promote respect for the law, and reflect the seriousness of the offense.

Defendant Joseph Nilsen's Sentencing Memorandum-47                              Justine A. Harris
*United States v. Nilsen, et al.,* No. CR20-151 RAJ                             Krista Staropoli
                                                                                Sher Tremonte LLP
                                                                                90 Broad St., Floor 23
                                                                                New York, NY 10004

1    Preliminarily, Section 3553(a)(2)(B) "does not require the goal of general deterrence be

2    met through a period of incarceration."  *United States v. Edwards*, 595 F.3d 1004, 1016 (9th Cir.

3    2010) (not unreasonable for district court to reject prison sentence to promote general deterrence;

4    defendant sentenced to five years of probation with seven months of home confinement on

5    Guidelines range of 27-33 months); *see also* S. Rep. No. 98-225, at 92 (1983) ("It may very

6    often be that release on probation under conditions designed to fit the particular situation will

7    adequately satisfy any appropriate deterrent or punitive purpose."  In fact, empirical studies

8    demonstrate that the length of sentences have no impact on general deterrence.  *See* Brian

9    Jacobs, *The Cost Of Affording Deterrence,* Forbes ( Nov. 16, 2021 at 04:31pm),

10   https://www.forbes.com/sites/insider/2021/11/16/the-cost-of-affording-

11   deterrence/?sh=5b2315167bd4 ("Recent scholarship, however, has confirmed (again) that the

12   'deterrence' theory under which thousands of defendants are sentenced *has no scientific basis* . . .

13   . Based on their research, they assert that '[w]e have seen that there is no conclusive evidence

14   that long-term prison sentences prevent recidivism [i.e. specific deterrence] or even that strong

15   punishment deters others from offending [i.e. general deterrence].'")  Rather, it is the fact of the

16   arrest – the prosecution itself – that has been found to deter others.  *See Five Things About*

17   *Deterrence*, National Institute of Justice (Jun. 5, 2016),  https://nij.ojp.gov/topics/articles/five-

18   things-about-deterrence ("[I]t is the certainty of being caught that deters a person from

19   committing crime, not the fear of being punished or the severity of the punishment."); Mirko

20   Bagaric, *A Rational Theory of Mitigation and Aggravation in Sentencing: Why Less is More*

21   *When It Comes to Punishing Criminals*, 62 Buff. L. Rev. 1159, 1205 (2014) ("Deterrence

22   properly informs sentencing only to the extent that it requires a hardship to be imposed for

Defendant Joseph Nilsen's Sentencing Memorandum-48
*United States v. Nilsen, et al.,* No. CR20-151 RAJ

Justine A. Harris
Krista Staropoli
Sher Tremonte LLP
90 Broad St., Floor 23
New York, NY 10004

1    criminal offending.  It does not require a particularly burdensome penalty, merely one that

2    people would seek to avoid.")

3          As the Government notes, the Amazon 3P community appears to be paying attention to

4    the case.  But that fact does not mean a lengthy sentence is needed.  Just the opposite.  It is public

5    knowledge that Mr. Nilsen and Ms. Leccese cooperated with the government; their guilty pleas

6    were made public and proffer notes were produced in discovery to both Mr. Nuhanovic and Mr.

7    Rosenberg, who at that time had yet to plead guilty.  It is also very public that for years after the

8    arrest, Ed Rosenberg repeatedly flaunted the government, criticized Amazon, and denied

9    responsibility for his crimes, *see supra*, n. 9.  Indeed, despite his professed remorse at

10   sentencing, it seems as if Mr. Rosenberg may be continuing to disclaim responsibility on various

11   message boards.  *See supra*, n. 9.  Thus, it would be both unjust and bad policy to impose a

12   lengthy sentence on Mr. Nilsen, who cooperated within 36 hours of his initial contact with the

13   FBI, while sentencing to home confinement and probation Mr. Rosenberg, who to this day

14   continues to deny responsibility.  Indeed, given Mr. Nilsen's prompt and extensive cooperation,

15   it would create an unwarranted sentencing disparity to sentence him more severely than Mr.

16   Rosenberg.  Conversely, to the extent the Court credits the Government's claim that Mr. Nilsen's

17   conduct was similar to Mr. Nuhanovic's, it would be a *warranted* sentencing disparity to credit

18   Mr. Nilsen's prompt cooperation with a more lenient sentence.  *See United States v. Leonti*, 326

19   F.3d 1111, 1117 (9th Cir. 2003) (recognizing that cooperation is a "crucial" aspect of plea

20   bargaining that warrant a downward departure).  At the heart of our criminal justice system are

21   foundational principles about accountability, and it is important that the sentencing process

22   meaningfully recognizes those, like Mr. Nilsen, who have accepted responsibility in profound

Defendant Joseph Nilsen's Sentencing Memorandum-49
*United States v. Nilsen, et al.,* No. CR20-151 RAJ

Justine A. Harris
Krista Staropoli
Sher Tremonte LLP
90 Broad St., Floor 23
New York, NY 10004

1    and real ways.

2         This is not to say that Mr. Nilsen does not deserve to be punished.  Nor does he seek to

3    minimize the seriousness of the offense.  As his attached letter to the Court makes abundantly

4    clear, he understands that there has to be a consequence for his criminal conduct:  "I had once

5    believed that I was exempt from the rules that govern others – a delusion that led to my actions.

6    Given this, I find it inappropriate to request special treatment now, as it contradicts the lessons

7    I've learned." *See* Ex. B, Ltr. of J. Nilsen.  But jail is not the only way to punish.  Home

8    confinement, coupled with strict conditions of supervised release, does impose significant

9    restrictions on a defendant's liberty, and does impose a real penalty.  As the Supreme Court has

10   recognized, "[p]robationers may not leave the judicial district, move, or change jobs without

11   notifying, and in some cases receiving permission from their probation officer or the court.  They

12   must report regularly to their probation officer, permit unannounced visits to their homes, refrain

13   from associating with any person convicted of a felony, and refrain from excessive drinking.

14   Most probationers are also subject to individual 'special conditions' imposed by the court." *Gall*,

15   128 S. Ct. at 595-96.  And of course, home confinement is even more punitive than simple

16   probation.

17        Additionally, Mr. Nilsen is prepared to pay the full restitution at sentencing and will

18   ensure he pays whatever fine the Court deems appropriate.  Moreover, the Court can fashion

19   substantial community service requirements that would require Mr. Nilsen to make amends to

20   the community proactively, rather than by sitting passively in a jail cell for months, at great risk

21   to his physical and mental health.  *See* Joseph Darius Jaafari, *Restorative Justice Programs That*

22   *Work*, Nation Swell (Sept. 14, 2018), http://nationswell.com/criminal-justice-reform-restorative/.

Justine A. Harris
Krista Staropoli
Sher Tremonte LLP
90 Broad St., Floor 23
New York, NY 10004

1    Finally, it bears emphasis that Mr. Nilsen has paid a heavy price already.  The FBI raided

2    and searched his home, and he has lived with the threat of a jail sentence for close to three years,

3    much of that time unemployed and nearly destitute.  Managing his anxiety and stress during that

4    process has been an enormous challenge.  As Dr. Landow reports, Mr. Nilsen's improved mental

5    health has "been marked with periods of regression, particularly as [Mr. Nilsen] has attempted to

6    navigate the overwhelming legal/justice system while fearing for his future." Ex. A, Landow

7    Report, at 12

8         F.    A Term of Incarceration Will Impose Hardship on Others

9    Finally, a lengthy sentence would burden Mr. Nilsen's loved ones – particularly his sister

10   Brittany, who has breast cancer, and his partner Kristen Leccese, who depends on him

11   financially and emotionally.  *See* Ex. C at 5, 15, 17.  It would also wreak havoc on his new

12   company's 26 employees.  *See* Ex. D at 2-3, 6-7.  While any term of incarceration imposes

13   hardship on dependents and loved ones, the particular needs of Mr. Nilsen's community militate

14   in favor of leniency – especially given Mr. Nilsen's cooperation with the government,

15   In October 2022, Mr. Nilsen's younger sister was diagnosed with Stage 2, Grade 3

16   cancer.  *See* Ex. C at 5-6.  Single and a public-school teacher, Mr. Nilsen's sister does not have

17   the resources to pay for her treatment and has turned to Mr. Nilsen who is eager to help however

18   he can.  *Id*.  Brittany Nilsen's annual out-of-pocket costs reach $8,500, and, with each

19   chemotherapy session, she is forced to take unpaid leave to recover.  *Id*.  Mr. Nilsen has provided

20   over $9,000in financial support, and is grateful that he is able to do so.

21   But Mr. Nilsen's support of his sister is not just financial.  He writes or calls her daily,

22   and Brittany Nilsen relies on Mr. Nilsen's moral support and love.  *See* Ex. C at 3, 6.  Mr.

Defendant Joseph Nilsen's Sentencing Memorandum-51
*United States v. Nilsen, et al.,* No. CR20-151 RAJ

Justine A. Harris
Krista Staropoli
Sher Tremonte LLP
90 Broad St., Floor 23
New York, NY 10004

1   Nilsen's generosity has meant the world to her.  In her attached letter, she writes, "Through each

2   stage of my battle with cancer, my brother has been my biggest cheerleader."  *See Id.* at 6  ("His

3   emotional and financial support have impacted my journey in a way that I can hardly put into

4   words.").  Brittany asks that the Court "consider the impact my brother's incarceration would

5   have on me as I continue in my battle against cancer."  *Id.*  Indeed, both the caselaw and the

6   guidelines authorize consideration of such needs.  *See* USSG §5H1.6; *United States. v. Leon*, 341

7   F.3d 928, 929 (9th Cir. 2003) (extraordinary family circumstances warrant downward departure).

8         Second, Mr. Nilsen, together with his business partner and Ms. Leccese, have built a

9   sustainable venture that employs 26 individuals.  As Mr. Nilsen developed the software for the

10  company and is involved daily with its development and application, the company would be

11  hard-pressed to survive for a lengthy period without him.  As Mr. Barker writes, "Mr. Nilsen's

12  business partner also recognizes that "frankly, without [Mr. Nilsen], this business would not have

13  the ability to run at all," and incarcerating Mr. Nilsen could effectively leave twenty-six people

14  unemployed.  *See* Ex. C at 2.  *See, e.g.*, *United States v. Milikowsky,* 65 F.3d 4, 8 (2d Cir. 1995)

15  (granting a downward departure where defendant was the "only individual with the knowledge,

16  skill, experience, and relationships" to run the business on a daily basis, and if incarcerated 150-

17  200 employees would be negatively impacted because the business was likely to fail)

18        Third, it is certain that if Mr. Nilsen is incarcerated for any period of time, Ms. Leccese

19  will struggle financially and emotionally.  The two have been together for ten years.  They spend

20  every waking minute together and have a profoundly deep bond forged through adversity – both

21  struggled with addiction, have suffered personal loss, and endured periods of serious poverty,

22  including being evicted from their apartment.  On the cusp of starting married life together, Ms.

Defendant Joseph Nilsen's Sentencing Memorandum-52
*United States v. Nilsen, et al.,* No. CR20-151 RAJ

Justine A. Harris
Krista Staropoli
Sher Tremonte LLP
90 Broad St., Floor 23
New York, NY 10004

1   Leccese would be distraught to carry the load of the business by herself, all while constantly

2   worrying about whether Mr. Nilsen will make it home in one piece.  They have gotten through

3   this difficult time only because they have each other.  As Ms. Leccese puts it in her letter to the

4   Court, through it all, they "pushed each other to keep going, no matter what."  Together, they

5   have reached a level of stability that on their darkest days they could never have imagined.  With

6   the light at the end of this very long, very dark tunnel, we respectfully ask for the Court's mercy.

7                                              **CONCLUSION**

8        For the foregoing reasons, we respectfully urge the Court to impose a non-custodial

9   sentence.

10

11  Dated: New York, New York
12          September 1, 2023
13

14                                          SHER TREMONTE LLP
15
16                                          By:  /s/
17                                              Justine A. Harris
18                                              Krista Staropoli
19                                              90 Broad Street, 23rd Floor
20                                              New York, NY 10004
21                                              (212) 202-2600
22                                              jharris@shertremonte.com
23                                              kstaropoli@shertremonte.com
24
25                                              *Attorneys for Joseph Nilsen*
26

27

Defendant Joseph Nilsen's Sentencing Memorandum-53                          Justine A. Harris
*United States v. Nilsen, et al.,* No. CR20-151 RAJ                          Krista Staropoli
                                                                            Sher Tremonte LLP
                                                                            90 Broad St., Floor 23
                                                                            New York, NY 10004